# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____

TELES AG                                )
INFORMATIONSTECHNOLOGIEN,               )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )         C.A. No. 09-072 (SLR)
                                        )
CISCO SYSTEMS, INC.,                    )
                                        )
            Defendant.                  )
_____)

### FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
### COUNTERCLAIMS OF DEFENDANT CISCO SYSTEMS, INC.

Defendant Cisco Systems, Inc. ("Cisco") answers Plaintiff Teles AG
Informationstechnologien's ("Teles") Original Complaint by specifically denying each and every
allegation contained therein, except those that are specifically admitted, modified, or qualified in
this First Amended Answer.

### NATURE OF THE ACTION

1.      Cisco admits that the Complaint purports to be an action for patent infringement.
Cisco denies any infringement of the patent in suit and the remaining allegations contained in
Paragraph 1.

### THE PARTIES

2.      Upon information and belief, Cisco admits that Plaintiff Teles is a corporation
organized and existing under the laws of Germany, having its principal place of business at
Ernst-Reuter-Platz 8, D-10587 Berlin, Germany.  Cisco is without knowledge or information
sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 2.

3.      Admitted.

## JURISDICTION AND VENUE

4.      Cisco admits that Teles purports to state a claim under 28 U.S.C. § 1338(a) and the patent laws of the United States, 35 U.S.C. § 1 et seq.  Cisco admits that this Court has jurisdiction over this action under one or more of 28 U.S.C. §§ 1331, 1332(a) and 1338(a). Cisco denies the remaining allegations in Paragraph 4.

5.      Paragraph 5 states a legal conclusion to which no response is necessary.  Cisco admits that it has registered to do business in the State of Delaware and has appointed a registered agent in the State of Delaware for purposes of accepting service of process.

6.      Cisco admits that venue is proper in this district for the purposes of this action. Cisco denies the remaining allegations in Paragraph 6.

## INFRINGEMENT OF U.S. PATENT NO. 7,483,431

7.      Cisco admits that the face of U.S. Patent No. 7,483,431 ("the '431 patent") indicates that it is entitled "Method For Transmitting Data In A Telecommunications Network And Switch For Implementing Said Method," and purportedly issued on January 27, 2009. Cisco further admits that a copy of the '431 patent was attached as Exhibit 1 to the Complaint. Cisco denies the remaining allegations contained in Paragraph 7 of the Complaint.

8.      Cisco denies the allegations contained in Paragraph 8 of the Complaint.

9.      Cisco denies the allegations contained in Paragraph 9 of the Complaint.

10.      Cisco admits that it is a technology company and that it offers consumers a wide range of products, including products that transmit data in accordance with various protocols. Cisco denies the remaining allegations contained in Paragraph 10 of the Complaint.

11.      Cisco denies the allegations contained in Paragraph 11 of the Complaint.

12.      Cisco denies the allegations contained in Paragraph 12 of the Complaint.

13.     Cisco denies the allegations contained in Paragraph 13 of the Complaint.

14.     Cisco denies the allegations contained in Paragraph 14 of the Complaint.

15.     Cisco denies the allegations contained in Paragraph 15 of the Complaint.

## DEFENSES

### FIRST DEFENSE

### FAILURE TO STATE A CLAIM

16.     Cisco incorporates by reference and re-alleges each and every allegation contained in Paragraphs 1 through 15 as though fully set forth herein.

17.     The Complaint fails to state a claim against Cisco upon which relief can be granted.

### SECOND DEFENSE

### NON-INFRINGEMENT OF THE '431 PATENT

18.     Cisco incorporates by reference and re-alleges each and every allegation contained in Paragraphs 1 through 17 as though fully set forth herein.

19.     Cisco has not infringed and does not infringe (either directly, contributorily or by inducement) any valid and enforceable claim of the '431 patent.

### THIRD DEFENSE

### INVALIDITY OF THE '431 PATENT

20.     Cisco incorporates by reference and re-alleges each and every allegation contained in Paragraphs 1 through 19 as though fully set forth herein.

21.     One or more of the claims of the '431 patent are invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103 and/or 112, and the rules, regulations, and laws pertaining thereto.

**FOURTH DEFENSE**

**UNENFORCEABILITY OF THE '431 PATENT DUE TO INEQUITABLE CONDUCT**

22.      Cisco incorporates by reference and re-alleges each and every allegation

contained in Paragraphs 1 through 21 as though fully set forth herein.

23.      The '431 patent states that it issued from U.S. Patent Application 11/456,549,

which was filed on July 10, 2006.  The '431 patent is a continuation of U.S. Application No.

11/165,280, filed on June 22, 2005, now U.S. Patent No. 7,145,902 ("the '902 patent"), which is

a division of U.S. Application No. 09/147,970, now U.S. Patent No. 6,954,453 ("the '453

patent"), which was filed on March 23, 1999.

24.      While the '431 patent application was still being prosecuted by Teles and its

counsel in the Patent Office, on November 27, 2007, in response to a request for *inter partes*

reexamination of claims 36, 37, 41, 54-58, 60-62, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90-

92, 98, 100, 102, 104, and 118-125 of the '902 Patent, the Central Reexamination Unit of the

Patent Office determined that a substantial new question of patentability existed with respect to

each of the challenged claims and ordered reexamination.  A true and correct copy of the Order

granting reexamination of the '902 patent is attached as Exhibit B hereto.

25.      On November 23, 2007, in response to a request for *ex parte* reexamination of

claims 34, 36-38 of the '453 patent, the Patent Office determined that a substantial new question

of patentability existed with respect to all of the challenged claims and ordered reexamination.  A

true and correct copy of the Order granting reexamination of the '453 patent is attached as

Exhibit C hereto.

26.      After multiple filings in the two reexaminations, while the '431 patent application

was still being prosecuted by Teles and its counsel, the Central Reexamination Unit finally

determined that all but two of the forty-two challenged claims of the '902 and '453 patents were invalid and thus were finally rejected. While the '431 patent application was still being prosecuted, Teles filed an appeal of the rejection of certain of the '902 claims (and also abandoned its attempt to argument that other '902 claims were patentable), and also filed an appeal of the rejection of the '453 claims. Cisco also filed an appeal with respect to the two '902 claims that were allowed and other issues.

27.     The '431 patent is unenforceable because Mr. Sigram Schindler, and his lead prosecution and reexamination counsel Mr. Vincent DeLuca of Novak, Druce, DeLuca & Quigg, LLP, acting on behalf of Teles, deliberately and knowingly withheld and/or omitted material information in connection with the prosecution of the application which matured into the '431 patent in violation of the duty of candor to the Patent Office prescribed in 37 C.F.R. § 1.56, including, without limitation, for the reasons set forth in Paragraphs 28 through 61 below. The information withheld and omitted by Mr. Schindler and Mr. DeLuca was highly material, and, they made the following omissions with an intent to deceive the '431 examiner and the Patent Office, as further described below.

28.     Mr. Schindler is one of the inventors of the '431 Patent, which at the time of the prosecution was purportedly assigned to Teles AG Informations-Technologien, or Teles. Mr. Schindler founded Teles in 1983 and holds the position of CEO. Mr. Schindler has been personally involved in the litigation against Cisco, in the conduct of the reexaminations of the '453 and '902 patents, in the drafting and submission of Teles' filings in the reexaminations, and in the prosecution of the '431 patent application.

29.     On information and belief, Mr. Schindler is also the sole shareholder of Sigram Schindler Beteiligungsgesellschaft mbH ("SSB"), a limited liability company, which owns 53%

of Teles. Mr. Schindler had and has a monetary interest in the outcome of the lawsuits filed by Teles against Cisco, and has repeatedly pursued multiple patents against Cisco in Europe and here in the United States. In part because the U.S. District Court for the District of Columbia had stayed Teles' claims against Cisco pending the results of the '902 reexamination, Mr. Schindler had a personal and financial interest to ensure that the '431 patent would issue in the shortest time period possible so that he could begin again to actively pursue additional claims against Cisco. To this end, he had an interest in concealing from or not disclosing the full facts and circumstances of the reexaminations to the '431 examiner, including (i) the fact that the Central Reexamination Unit in the Patent Office had repeatedly rejected essentially identical subject matter claims in the co-pending reexaminations of the '902 and '453 patents on the grounds of multiple prior art references that were also highly material and adverse to the pending '431 claims; and (ii) the fact that Teles had abandoned various of the rejected claims during the '902 reexamination and was no longer contending that the claims were patentable, including claims that contained essentially identical subject matter to the claims pending in the '431 application.

30.    Mr. DeLuca was counsel to Teles and to Mr. Schindler with respect to both the co-pending '453 and '902 reexaminations and the '431 prosecution. He signed and filed papers in both the reexaminations and the '431 prosecution during the same time period, so he clearly had full knowledge of all the material information discussed below, including the existence and grounds for the Cisco requests for reexamination and the grounds upon which the Central Reexamination Unit found the Cisco requests to raise "substantial new questions of patentability," the scope of and basis for the multiple rejections by the Central Reexamination Unit of the '453 and '902 claims, the disclaimers, statements and arguments that Teles was

making concerning the scope of the '453 and '902 claims during the reexaminations, and of Teles' abandonment of certain unpatentable claims during the reexaminations..

31.     There is no record in the '431 patent file history that Mr. DeLuca, Mr. Schindler or anyone else acting on behalf of the applicants ever informed the '431 examiner of various highly material facts, including (i) the existence of and bases for the co-pending reexaminations of the '902 and '453 patents; (ii) the fact that the Central Reexamination Unit in the Patent Office had repeatedly rejected essentially identical subject matter claims in the co-pending reexaminations of the '902 and '453 patents; or (iii) the fact that Teles had abandoned various of the rejected claims during the '902 reexamination and was no longer contending that the claims were patentable, including claims that contained essentially identical subject matter to the claims pending in the '431 application.

32.     Counsel for Teles has alleged, but not provided any supporting evidence, documents or testimony, that in or about December 2007 "after the reexaminations of the '453 and '902 Patent were ordered, an interview in the '431 Patent application was held with Primary Examiner Afsar M. Qureshi in which the reexaminations were raised."  There is no evidence in the '431 file of such an interview, and Teles has so far refused to provide the full details of the alleged interview, such as all those who was there with Mr. DeLuca on behalf of Teles, what was said, when it occurred, precisely what was and what was not disclosed to the '431 examiner, and whether there are any corroborating documents.

33.     Nor is there any evidence in the record that the '431 patent examiner was aware of or considered the co-pending reexaminations, the prior art cited to the Central Reexamination Unit and the arguments made concerning that prior art, or the fact that the Central Reexamination Unit had repeatedly rejected similar '453 and '902 claims during his review of the '431 patent

7

application.

34.    Teles and Mr. DeLuca and his law firm have also intentionally blocked and refused to answer discovery requests and provide any information, documents or testimony concerning any communications with the '431 examiner regarding the reexaminations.

35.    For the reasons stated herein, Mr. Schindler and Mr. DeLuca knowingly failed to disclose highly material facts to the '431 examiner, with an intent to deceive the examiner into allowing claims in the '431 application that were otherwise unpatentable without consideration of the reexaminations and the results of those reexaminations.

36.    Neither Mr. Schindler nor Mr. DeLuca ever provided the '431 examiner any copies of the Cisco reexamination filings, the decisions of the Central Reexamination Unit granting reexaminations of the '902 and '453 patents, the office actions of the Central Reexamination Unit, the briefs and papers filed by Teles and by Cisco addressing the unpatentability of the claims and the grounds for rejecting the claims, or the papers of Teles in which Teles abandoned its efforts to overcome the Central Reexamination Unit's rejection of certain claims of the '902 patent.

37.    Cisco further states that during both the *inter partes* and *ex parte* reexaminations, Mr. DeLuca and also litigation counsel for Teles, the Howrey firm, were served with copies of the entire reexamination record, so they had the information and could have easily disclosed it to the '431 examiner, but deliberately chose not to do so.

38.    The omitted and withheld information is highly material at least in part because the claims of the '431 Patent are substantially similar to, overlap, and are obvious variants of, the claims that the Patent Office rejected in the '453 and '902 reexamination proceedings.  Generally speaking, the Teles patents are directed to the routing of telephone calls or data transmission by

switches that provide connections to either a circuit switched network (an example of which is the "public switched telephone network" or "PSTN") or to a "packet switched" network such as the Internet.  The patents refer to dynamically switching an ongoing call from a packet network to a switched network during the call, without interrupting the connection between the sender and receiver.  The '431 Patent asserts claims based on the same kind of devices, using a "mobile packet switched network."  The claims of the '431 Patent are obvious variants of the reexamined claims of the '453 and '902 patents, as was confirmed by the '431 Patent Examiner during an interview with Mr. DeLuca that was conducted on September 30, 2008.

39.     For example, claim 36 of the '902 patent, which was rejected by the Patent Office during the '902 reexamination as anticipated by the prior art, and which Teles subsequently abandoned in the reexamination, is identical to claim 46 in '431 patent with the exception of referring to a "mobile packet switching network" rather than a "packet switching network," as shown in the following chart:

| '902 Patent, Claim 36 | '431 Patent, Claim 46 |
|---|---|
| A method for transferring data selectively by line switching or by packet switching from a first switch to a second switch, the first switch being part of or having access to a line-switching network and a packet switching network, comprising: | A method for transferring data selectively by line switching or by packet switching from a first switch to a second switch, the first switch being part of or having access to a line-switching network and a mobile packet switching network, comprising: |
| packetizing the data into data packets in the first switch if the data does not yet exist as data packets | packetizing the data into data packets in the first switch if the data does not yet exist as data packets; |
| transferring the data packets from the first switch through the packet-switching network to the second switch | transferring the data packets from the first switch through the mobile packet-switching network to the second switch; |
| checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching | checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the mobile packet switching network to a line-switching |

| '902 Patent, Claim 36 | '431 Patent, Claim 46 |
|---|---|
| connection to the second switch, wherein the control signal is produced by a network management system | connection to the second switch, wherein the control signal is produced by a network management system; |
| establishing the line-switching connection through the line-switching network to the second switch in response to said control signal, if the line-switching connection is not yet present; and | establishing the line-switching connection through the line-switching network to the second switch in response to said control signal, if the line-switching connection is not yet present; and |
| changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching data transfer in response to said control signal and transferring data over the line switching connection to the second switch. | changing-over from the packet-switching data transfer of the data packets through the mobile packet switching network to a line-switching data transfer in response to said control signal and transferring data over the line switching connection to the second switch. |

40.    Another of the claims rejected by the Patent Office – claim 34 of the '453 patent – also contains essentially identical language as that in claim 45 of the '431 patent, and claim 45 is an obvious variant of claim 34 of the '453 patent, as shown in the following chart:

| '453 Patent, Claim 34 | '431 Patent, Claim 45 |
|---|---|
| Switching apparatus for routing a telephone call comprising non-packetized data from a first end terminal located at a user's premises to a second end terminal located at another user's premises, selectively by line switching or packet switching, the switching apparatus comprising: | Switching apparatus for routing a telephone call from a first end terminal to a second end terminal, selectively by line switching or packet switching, the switching apparatus comprising |
| means for establishing a connection through a line-switching network to the second end terminal | means for establishing a connection through a line-switching network to the second end terminal; |
| means for line-switching transferring data received from the first end terminal as non-packetized data over the line-switching network to the second end terminal | means for line-switching transferring data received from the first end terminal over the line-switching network to the second end terminal; |
| means for establishing a connection through a | means for establishing a connection through a |

10

| '453 Patent, Claim 34 | '431 Patent, Claim 45 |
|---|---|
| packet-switching network to the second end terminal | mobile packet-switching network to the second end terminal; |
| means for packet-switching transferring data received from the first end terminal as non-packetized data over the packet-switching network to the second end terminal; and | means for packet-switching transferring data received from the first end terminal over the mobile packet-switching network to the second end terminal; and |
| means responsive to a control signal for transferring to a line-switching transfer or a packet-switching transfer to the second end terminal; said means responsive to a control signal changing-over to a line-switching data transfer or a packet-switching transfer during the existing transfer with the presence of said control signal. | means responsive to a control signal for transferring to a line-switching transfer or a packet-switching transfer to the second end terminal; said means responsive to a control signal changing-over to a line-switching data transfer or a mobile packet-switching transfer during the existing transfer with the presence of said control signal. |

41.     The claims of the newly asserted '431 patent thus clearly overlap with and are obvious variants of the claims of the Teles' '453 and '902 patents that were rejected by the Central Reexamination Unit as unpatentable during the reexaminations and, as to some of the claims, which Teles itself abandoned during the reexaminations.  The existence of the reexaminations, the detailed grounds for invalidity asserted by Cisco and adopted by the Central Reexamination Unit in the reexamination proceedings, the fact of the Central Reexamination Unit's rejection of the claims and its reasoning for such rejections and the art it relied upon, and the fact of Teles' abandonment of certain claims, constitute highly material and noncumulative information with respect to the patentability of the claims of the '431 Patent.  Furthermore, the contents of both the Cisco submissions and the Examiner's office actions and rejections also constitute highly material information in that they contained detailed information for each limitation on a claim-by-claim basis as to why the claims were invalid as anticipated or obvious.

42.     For example, the Central Reexamination Unit found that Focsaneanu, U.S. Patent

No. 5,610,910 ("Focsaneanu") raised a substantial new question of patentability with respect to multiple other claims from the '902 patent under reexamination. A true and correct copy of Focsaneanu is attached as Exhibit D hereto.

43.     On November 27, 2007, the Central Reexamination Unit issued a detailed Office Action rejecting claim 36 (and other claims) based on Focsaneanu. A true and correct copy of the Office Action, which is incorporated by reference herein, is attached as Exhibit B hereto. Beginning at page 4 of the Office Action, the Central Reexamination Unit explained the relevance of Focsaneanu to each limitation of claim 36 and provided citations to where in the reference the pertinent information was found. *See id.* at 4-10 (office action).

44.     As stated above, claim 36 of the '902 patent is identical to claim 46 in '431 patent with the exception of referring to a "mobile packet switching network" rather than a "packet switching network." The additional limitation of a "mobile packet switching network" is specifically disclosed in Focsaneanu. For example, Focsaneanu discloses the use of telephones and wireless communication devices (e.g., a mobile phones) that can carry out packet-switching connections over either a line-switching network (the PSTN) and a data-switching network (e.g., the Internet). *See* FIG. 2 and col. 2:10-15 ("FIG. 2 also shows a wireless connection. For wireless service, the CPE is connected through the wireless interface or CPE connector 40 and a radio frequency channel 52 to a base station or access module 42, and then to the wireless services provider who in turn provides a connection to the specific service or transport network such as PSTN 54."); *see also* col. 3:56-59, col. 4:42-45 and 58-64, and col. 7:10-15. A claim chart comparing claim 46 of the '431 patent as compared with Focsaneanu is attached as Exhibit E hereto. Focsaneanu anticipates or renders obvious claim 46 of the '431 patent.

45.     On November 23, 2007, the PTO issued an order granting an *ex partes*

reexamination of claims 34-36 and 38 of the '453 patent. A true and correct copy of the Order is attached as Exhibit C hereto. The PTO found a substantial new question of patentability affected each of these claims. The Central Reexamination Unit, as with the '902 patent, also found that Focsaneanu raised a substantial new question of patentability with respect to claim 34 of the '453 patent. *See id.* at 6 – 8.

46.    As stated above, claim 34 of the '453 patent is substantially the same as claim 45 of the '431 patent.

47.    A claim chart comparing claim 45 of the '431 patent as compared with Focsaneanu is attached as Exhibit E hereto.

48.    There is no record, however Mr. Schindler or Mr. DeLuca – who had direct knowledge of and participation in the reexaminations, since they were drafting and signing Teles' filings and were receiving Cisco's filings and the Office Actions that rejected the '453 and '902 claims – ever disclosed the reexaminations to the '431 examiner. They continued to conceal material facts concerning the '453 and '902 reexaminations even after the '431 examiner requested a terminal disclaimer from Teles during the '431 prosecution on the ground that the pending '431 claims were unpatentable as obvious variants of the claims in the earlier patents.

49.    It was clear to Mr. Schindler and Mr. DeLuca at the time of this request that the '431 examiner considered the '431 claims to be obvious variants of the '453 and '902 claims and thus not patentable in light of claims that Mr. Schindler and Mr. DeLuca knew had already been rejected as invalid in the '902 and '453 reexaminations. But rather than disclose any information to the '431 examiner concerning the status of the reexaminations and or the unpatentability of the '453 and '902 claims, Mr. DeLuca and Mr. Schindler chose instead simply to submit a terminal disclaimer, without making any disclosure at all about the reexaminations or the status of the

'453 and '902 claims. They made this decision to omit all the material information about the reexaminations and not disclose it to the '431 examiner with an intent to deceive the '431 examiner into thinking that the '431 claims were also patentable and to speed the issuance of the '431 patent. In addition, Mr. Schindler and Mr. DeLuca intentionally failed to disclose to the '431 examiner that Teles itself had abandoned as unpatentable multiple '902 patent claims, including '902 claim 36 which was substantively identical and an obvious variant to at least one of the pending '431 claims.

50.     Mr. Schindler and Mr. DeLuca also concealed from the '431 examiner that Teles had made repeated explicit statements to the Central Reexamination Unit regarding the narrow scope of claim language from the '453 and '902 claims that was also contained in the '431 claims then being examined. The material statements that Teles had made during the reexamination included statements and disclaimers to the effect that each of the claims at issue in the '902 reexamination (including claims that contained language referring to a change-over occurring "without interruption of a call set-up procedure") were limited to a change-over between different types of switching during a real-time, end-terminal-to-end-terminal data transfer, without interruption of the ongoing connection. *See e.g.,* Owner's Response filed 5/2/08 at pages 8, 11, and 20-22. A true and correct copy of the Owner's Response filed on May 2, 2008 is attached as Exhibit F hereto.

51.     The '431 examiner – if Mr. Schindler and Mr. DeLuca had disclosed the existence, substance, and results of the reexaminations, as well as the reasoning and arguments of both parties and of the Central Reexamination Unit – would have considered such information concerning the clear invalidity of the subject matter of the claims before him, as revealed by the reexaminations, highly important to the patentability of the '431 claims and would have stopped,

or at a minimum delayed, the issuance of the '431 patent, and/or forced Teles to amend its proposed '431 patent claims.  There is no record in the '431 patent file history that the examiner was aware of any information about the reexaminations or that he considered it during his review of the proposed '431 claims.

52.     Mr. Schindler's and Mr. DeLuca's failure to disclose material information to the examiner of the '431 patent was done knowingly and intentionally, and with intent to deceive the examiner and the Patent Office into quickly issuing a new patent to be asserted against Cisco, even though the '431 claims were not patentable or were at a minimum subject to substantial questions about their validity.  Notably, at the time of the alleged inequitable conduct by Mr. Schindler and Mr. DeLuca, the prior litigation against Cisco based on the '453 and '902 patents had been indefinitely stayed by Judge Walton in the District of Columbia pending the resolution of the '902 reexamination.  At the time the '431 application was being pursued by Mr. Schindler and Mr. DeLuca, they both knew that the asserted claims of the '453 and '902 patents either stood rejected, abandoned, or on appeal, and thus that they could very well be left with no claims against Cisco, if and when the stayed litigation finally resumed.  During this time, Teles repeatedly argued to Judge Walton that time was of the essence in the litigation between Cisco and Teles due to Teles' inability to penetrate the United States VoIP market occupied by Cisco and others.  Mr. Schindler and his attorney Mr. DeLuca had every incentive into deceiving the '431 examiner into allowing the '431 claims quickly, so that they could assert a new lawsuit against Cisco in a different jurisdiction where no stay would be pending.  In fact, that is what Teles and Mr. Schindler decided to do just two days after '431 patent issued, filing the instant case in Delaware rather than the District of Columbia where litigation between the same parties had been pending since October 2005.

53.     The material information that Mr. Schindler and Mr. DeLuca withheld is expressly required to be disclosed by the Code of Federal Regulations and the Manual for Patent Examining Procedure ("MPEP").  The relevant information withheld from the '431 examiner includes: (i) the status and details of the litigation *Cisco Systems, Inc. v. Teles AG Informationstechnologien* (Civil Action No. 1:05-CV-02048 (RBW)) (D. D.C.) [now transferred to this Court as Civil Action No. 09-232], in which the '453 and '902 patents are currently at issue, as required by 37 C.F.R. § 1.56 and MPEP § 2001.06(c), as well as particularly the interrogatory responses of Cisco in that litigation which identified in detail numerous prior art references and set forth the reasons (including detailed claim charts for multiple references) why the claims of the '453 and '902 Patents were invalid in light of the prior art; and (ii) the existence, details, reasoning and status of the ongoing reexamination proceedings for both the '902 and '453 patents, as required by 37 C.F.R. § 1.56 and MPEP § 2001.06, including without limitation the submissions of Cisco and Teles, as well as the findings by the reexamination examiners that rejected the substantially similar claims in those reexaminations.

54.     These non-disclosed materials are clearly material to patentability.  The Patent Office itself found the references cited in the reexaminations to have raised "substantial new questions of patentability" and to also provide grounds for rejecting claims that had been previously issued, which have essentially the same scope as the issued claims of the '431 patent, which the '431 examiner himself concluded were just obvious variants of the '453 and '902 claims.  The substantial new questions of patentability that the Patent Office determined on reexamination existed for the '453 and '902 claims were based on references that included U.S. Patent No. 5,610,910 to Focsaneanu, U.S. Patent No. 6,137,792 to Jonas, U.S. Patent No. 5,732,078 to Arango, U.S. Patent No. 4,996,685 to Farese, U.S. Patent No. 5,598,411 to

Matsukawa, U.S. Patent No. 5,347,516 to Yoshida, U.S. Patent No. 6,069,890 to White, and

"Lucent Technologies announces Internet telephone servers to put voice, fax and voice mail on

the Internet," *Lucent Technologies*, September 17, 1996.  The Patent Office relied upon each of

these references in rejecting one or more of the reexamined claims of the '453 or '902 patents on

grounds of either anticipation or obviousness, including claim 36 of the '902 patent and claim 34

of the '453 patent which are virtually identical to claims 46 and 45 respectively of the '431

patent.

      55.     Mr. Schindler and Mr. DeLuca, however, intentionally and with intent to deceive

failed to disclose to the '431 examiner, at least that the '431 claims then being considered by the

examiner were obvious variants of '902 and '453 claims that had been rejected by the Central

Reexamination Unit, and they also failed to disclose the reasoning adopted by the Central

Reexamination Unit, as well as the detailed information contained in the Cisco filings and in the

reexamination office actions detailing the relevant portions of the cited references.

      56.     By definition, the U.S. Patent Office has determined that the '453 and '902

reexaminations raised substantial *new* questions or patentability, so the information submitted,

and the resulting rejections by the Central Reexamination Unit, were by definition not

cumulative of any prior information before the '431 examiner.

      57.     Even after the Patent Office finally rejected all but two of the challenged claims

of the '902 and '453 patents as invalid, Teles, Mr. Schindler and Teles' counsel, Mr. DeLuca,

still failed to disclose to the '431 examiner Cisco's arguments concerning this prior art (and other

art disclosed in interrogatory responses during the litigation), the existence of the

reexaminations, the contents of the parties filings in the reexamination, or the findings of the

examiners during the reexaminations.  On September 30, 2008, Mr. DeLuca even held a meeting

with the '431 examiner regarding the '431 patent application, after the rejection of the claims in the '453 and '902 patents during the reexaminations, but still failed to disclose the reexaminations and/or the grounds for the rejections to the '431 examiner.  Without knowing this highly material information, the examiner issued a notice of allowance on October 23, 2008, in which he indicated that the claims were allowable over the closest prior art.  The only art that the '431 examiner identified in the statement of reasons for allowance were U.S. Patent No. 6,574,216 to Farris et al. and U.S. Patent No. 5,852,721 to Dillon et al., and this citation was made without the benefit of having seen the reexamination materials or having considered the substantial new questions that were raised by the reexamination, or having considered the detailed reasoning prepared by the Reexamination Examiner in rejecting virtually identical claims.

58.     As of at least October 3, 2008, twenty days before the notice of allowance was issued, Teles, Mr. Schindler, and Teles' counsel, Mr. DeLuca, also knew that the Patent Office had rejected all but two of the challenged claims of the '453 and '902 patents as either anticipated or obvious.  Nonetheless, upon information and belief, Mr. Schindler and Mr. DeLuca knowingly and intentionally failed to disclose this material information to the '431 examiner, and allowed then-pending claims that were substantially similar and overlapping, if not identical in substance, to proceed to issuance.  Teles' counsel during the reexaminations, moreover, was the same counsel that was prosecuting the application that issued as the '431 patent.

59.     At the time that the '431 patent issued on January 27, 2009, there was no record in the file history of the existence of the co-pending reexaminations of '453 and '902 patents or that the Central Reexamination Unit of the Patent Office had repeatedly and finally rejected those

claims as being anticipated or rendered obvious by multiple pieces of prior art.  Nor was there

any record in the file history that the examiner was made aware of any of this information.

60.     Teles does not contend that the '431 patent file history has a record that the

examiner was informed about the existence of the co-pending reexaminations of '453 and '902

patents or that the Central Reexamination Unit of the Patent Office had repeatedly and finally

rejected those claims as being anticipated or rendered obvious by multiple pieces of prior art.

61.     Upon information and belief, Teles, Mr. Schindler, and their counsel, Mr.

DeLuca, deliberately and knowingly withheld and/or omitted material information in connection

with the prosecution of the '549 application, which matured into the '431 patent, in violation of

the duty of candor to the Patent Office prescribed in 37 C.F.R. § 1.56.  Such conduct constitutes

inequitable conduct that renders the '431 patent unenforceable.

**FIFTH DEFENSE**

**UNENFORCEABILITY OF THE '431 PATENT
DUE TO INFECTIOUS INEQUITABLE CONDUCT**

62.     Cisco incorporates by reference and re-alleges each and every allegation

contained in its responses to Paragraphs 1 through 61  as though fully set forth herein.

63.     The '431 patent is also unenforceable due to infectious inequitable conduct in the

prosecution of the related '453 and '902 patents before the Patent Office by Mr. Sigram

Schindler and prosecuting attorneys Messrs. D. Bruce Prout and Richard Paciulan, then of the

law firm Christie, Parker & Hale LLP.  Acts constituting such inequitable conduct include,

without limitation, at least those set forth in Paragraphs 64 through 79.   The information

withheld and omitted by Mr. Schindler and Messrs. Prout and Paciulan was highly material, and,

they made each of the following omissions with the intent to deceive the '453 examiner and the

Patent Office as further described below.

64.    The '453 patent states that it was based upon U.S. Patent Application Serial No.

09/147,970 ("the '970 application"), which was filed on March 23, 1999 ("the '970 filing date").

The '453 patent further identifies the '970 application as claiming priority from international

application PCT/DE97/02363 (the "PCT application"), which is identified as filed under the

provisions of the Patent Cooperation Treaty on October 7, 1997 (the "PCT filing date").  The

PCT application claims priority from two applications identified as being filed in Germany:  DE

196 42 063 (the "DE '063 application"), identified as being filed on October 7, 1996; and DE

196 45 368 (the "DE '368 application"), identified as being filed on October 23, 1996.  These

applications also were cited by Teles as priority for a European Patent, No. EP0929884 B1 (the

EP '884 patent).

65.    The '453 patent identifies Messrs. Sigram Schindler, Andreas Illg, Karsten

Lüdtke and Franck Paetsch as named inventors.  Mr. Schindler founded Teles in 1983, has

remained with the company since its founding and is presently its Chief Executive Officer.

66.    Prior to the issuance of the '453 patent, Quintum Technologies, Inc. ("Quintum")

challenged the EP '884 patent in a nullity action filed in Germany (the "Quintum nullity").  The

complaint in the Quintum nullity cited and described in detail material prior art references and

systems.  Both the contents of the Quintum nullity complaint and the cited prior art references

themselves from that filing were not disclosed to the PTO during the prosecution of the '970

application, including:

- TAXI System, User Manual, Manual Version 2.0 (English Version), December 1995 (the "TAXI reference");

- IDB 64/2, Benutzer-Handbuch, Software Release 4.11, March 1996;

- Hans-Jochen Schneider, Lexikon der Informatik und Datenverarbeitung, 2d ed., 1986;

- Manu Malek, Integrated Voice and Data Communications Overview, IEEE Communications Magazine, vol. 26, no. 6, June 1988;

- Claude Wacker, Interconnection of LANs using ISDN, 2nd Joint European Networking Conference, May 1991;

- Vocaltec Introduces The Internet Phone Telephony Gateway Linking Traditional and Internet Telephone Networks, Press Release, March 8, 1996;

- Vocaltec Links Phones to Web, Discount Long Distance Digest News, August 2, 1996;

- NetWare MultiProtocol Router for ISDN 3.1 Installation and ISDN Configuration Guide, 1996;

- Telefonieren auf dem Novell-Netz, LANline, February 1995;

- LAN und TK-Funktionen wachsen zusammen, LANline, July 1995;

- Das LAN wird zur Telefonanlange, ntz, vol. 4/1995;

- Realisierung von LAN-Diensten über TK-Anlagen, ntz, vol. 12/1992;

- Christian J. Jenny and Karl Kümmerle, Distributed Processing Within an Integrated Circuit/Packet-Switching Node, IEEE Transactions on Communication, vol. Com-24, no. 10, October 1976**;**

- Gino J. Coviello and Robert E. Lyons, Conceptual Approaches to Switching in Future Military Networks, IEEE Transactions on Communication, vol. Com-28, no. 9, September 1980**;**

- Brij Bhushan and Holger Opderbeck, The Evolution of Data Switching for PBX's, IEEE Journal on Selected Areas in Communication, vol. Sac-3, no. 4, July 1985;

- Tohru Kohashi, et al., Integrated Circuit and Packet Switching Applications to a Loop System for Local Area Networks, IEEE Journal on Selected Areas in Communication, vol. Sac-3, no. 4, July 1985;

- Mark J. Karol and Michael G. Hluchyj, Using a Packet Switch for Circuit-Switched Traffic: A Queuing System with Periodic Traffic Input, IEEE Transactions on Communication, vol. 37, no. 6, June 1989; and

- William Stallings, ISDN and Broadband ISDN with Frame Relay and ATM, 3d ed., April 1995.

67.     Mr. Schindler was involved in the Quintum nullity action and was aware of the

references cited therein, because he or his attorneys were served with a copy of Quintum's

nullity complaint and because Mr. Schindler was personally involved in the nullity proceedings.

68.    Upon information and belief, Mr. Prout and Mr. Paciulan were also aware of the

references as well, before the issuance of the '453 patent.

69.    For reasons that include those enumerated in the Quintum nullity complaint, the

prior art disclosed below is material to the patentability of the '453 patent, which is a counterpart

of the patent challenged in Europe.  The references should have been disclosed to the PTO

during the prosecution of the '970 application prior to the issuance of the '453 patent on October

11, 2005.

70.    The references were material to at least Claims 1-4, 21-24, 26 and 34 of the '453

patent.  For example, independent claim 1 of the European patent challenged in the Quintum

nullity action is materially the same as Claim 21 later allowed in the '453 patent.

| **Claim 1 of EP0929884** | **Claim 21 of US Patent No. 6,954,453** |
|---|---|
| A method for transmitting data from a first switch to a second switch, | A method for transferring data from a first end terminal to a second end terminal, |
| which are components of a line-switching network or have access to a line-switching network, | |
| either by line-switching or by packet-switching, consisting of the following steps: | selectively by line-switching or packet switching, comprising: |
| a) formation of a connection over the line-switching network from the first switch to an access point of a packet-switching network, | a) establishing a connection through a line-switching network from the first end terminal to an access point of a packet switching network; |
| b) line-switching transmission of the data from the first switch to the access point of the packet-switching network, | b) line-switching transferring of non-packetized data through said connection from the first end terminal to the access point of the packet-switching network; |
| c) packeting the data if it is not already in data packets, | c) packeting of the data into data packets |

| | |
|---|---|
| and packet-switching transmission of the data packets over the packet-switching network from the access point to the second switch, | and packet-switching transferring of the data packets through the packet-switching network from the access point to the second end terminal; |
| d) repeated checking whether there is a control signal for transfer to a line-switching connection to the second switch, | d) checking repeatedly whether a control signal exists for transferring to a line-switching connection to the second end terminal; |
| whereby this signal is emitted by the user of an end device or a network management, | |
| e) formation of a line-switching connection from the first switch to the second switch over the line-switching network when there is a corresponding control signal if such a line-switching connection does not already exist, | e) establishing the line-switching connection, during an existing transfer, through the line-switching network from the first end terminal to the second end terminal with a presence of the control signal, if the line-switching connection is not yet present; and |
| f) changing to line-switching data transmission during the existing connection | f) changing-over to a line-switching data transfer during the existing transfer |
| and transmission of the data to the second switch. | and transferring data over the line-switching connection to the second end terminal. |

71.    For example, and without limitation, various references, including the prior art documents "Taxi System, User Manual Version 2.0" December 1995," and "IDB-64/2 Benutzerhandbuch" were highly material to the claims of the '453 patent because they disclose in the prior art that the method of, e.g., Claim 21 of the '453 patent, was known in the art through publications and already being practiced in Germany in one or more commercial devices.

72.    These references, and others described in the Quintum nullity complaint, disclose for example, that the TAXI system in use as of late 1995 had an "intelligent" back-up function, in which a packet-switched data link between two switches is constantly monitored, and if the link fails, the TAXI system automatically establishes a back-up line-switched connection so as to enable the system to change over to the line-switching back-up connection during the ongoing

transfer of data between the switches.

73.     Such a reference was material because it was not cumulative of the references already cited and it would have anticipated or rendered obvious at least Claim 21 of the '453 patent, which was allowed by the U.S. patent examiner after the existence of the Quintum nullity references were concealed from the examiner.  A chart showing Claim 1 of the European patent challenged in the Quintum nullity action in a first column, the similar elements of Claim 21 of the '453 patent in a second column, and the disclosure of the TAXI reference that incorporates each element of those claims in a third column, which disclosure was set out in the Quintum nullity complaint, is attached as Exhibit G.  The TAXI reference was not cumulative information at least because the TAXI reference is anticipatory and the Patent Office during the '453 examination did not find any of the cited references to be anticipatory of the claims as finally issued.

74.     Mr. Paciulan and Mr. Prout (collectively the "Christie attorneys") and/or Mr. Schindler, all acting on behalf of Teles, deliberately and knowingly and with an intent to deceive the Patent Office withheld these material references in violation of the duty of candor to the PTO prescribed in 37 C.F.R. § 1.56.

75.     Although Quintum had provided notice of these references to Teles and Mr. Schindler in or about July 2005, and although Mr. Schindler was personally participating in both the response to the Quintum nullity action and in the simultaneous prosecution of the '453 application, Mr. Schindler either withheld the references from his U.S. attorneys or Mr. Schindler and the Christie attorneys made a deliberate decision not to disclose them to the '453 examiners so as to cause the examiner to allow the '453 patent to issue with invalid claims, including Claim 21.  At no time  prior to the issuance of the '453 patent did Mr. Schindler or the

Christie attorneys disclose the above references or the Quintum nullity action and the detailed discussion of the materiality of those references in the nullity action to the U.S. patent examiners for the '453 patent.

76.     Indeed, Mr. Schindler and the Christie attorneys (who were attorneys of record for the '902 application and prosecution counsel from at least the filing of Application No. 11/165,280 on June 22, 2005 until February 9, 2006, when they were replaced by Mr. Vincent DeLuca and the firm of Novak Druce DeLuca & Quigg LLP), continued to withhold the above references and the existence of the Quintum nullity action from the U.S. examiners of the '902 patent as well.  It was not until the filing of an IDS on or about March 20, 2006, that the references were submitted by the Novak Druce firm to the examiners during the '902 prosecution.  The belated submission of these references during the '902 prosecution, which occurred only after the '453 patent had issued, is confirmation that the references were known to Mr. Schindler from at least the date of the Quintum nullity complaint, yet had been withheld from the U.S. examiners during the '453 examination.

77.     The '902 patent identifies itself as issuing from U.S. Patent Application Serial No. 11/165,280 (the "'280 application), which was filed on June 22, 2005 (the "'280 filing date"). The '902 patent further identifies the '280 application as a division of the '970 application.  The '431 patent identifies itself as issuing from U.S. Patent Application Serial No. 11/456,549 (the "'549 application"), which was filed on July 10, 2006 (the "'549 filing date").  The '431 patent further identifies the '549 application as a continuation of the '280 application.

78.     The violation of the duty of candor by the applicants and/or individuals acting on behalf of the applicants bears an "immediate and necessary relation" to the '902 and '431 patents and the claims thereof, and therefore renders the '902 and '431 patents unenforceable under the

doctrine of infectious unenforceability.  The '431 examiner requested a terminal disclaimer from Teles on the grounds that the pending '431 claims were unpatentable as obvious variants of the '902 claims.  Similarly, the '902 examiner rejected all claims of the '902 patent as being obvious variants of the '453 claims, and also required a terminal disclaimer in order to allow issuance of the '902 claims.  All of the asserted claims in the '431, '902 and '453 patents were already considered by the Patent Office to claim nothing more than obvious variations of a certain invention.

79.     Disclosing the references withheld during the prosecution of the '970 application during the prosecution of the '280 application cannot cure the applicants' violation of the duty of candor during the prosecution of the '970 application and its infection of the '280 and '549 applications.

## FIFTH DEFENSE

## PROSECUTION ESTOPPEL

80.     By reason of the proceedings in the Patent Office during the prosecution of the '431 Patent, and during the reexamination of the '453 and '902 patents, and by reason of amendments, positions, concessions, statements and/or representations taken or made by or on behalf of the applicant, Teles is estopped from asserting the '431 patent against any products made, used, offered for sale or sold by Cisco.

## SIXTH DEFENSE

## ESTOPPEL

81.     Teles is barred from asserting its claims based on estoppel.

## SEVENTH DEFENSE

## UNCLEAN HANDS

82.     Teles is not entitled to equitable relief from this Court due to its unclean hands in attempting to enforce the '431 Patent in bad faith, knowing that the '431 Patent is invalid and/or unenforceable, and without a reasonable basis to believe that Defendant has infringed the '431 Patent.

## EIGHTH DEFENSE

### 35 U.S.C. §§ 286 AND 287

83.     Teles' claims for damages are limited by 35 U.S.C. §§ 286 and 287.

## NINTH DEFENSE

84.     At all times, Cisco has acted and competed lawfully, without any improper motive or means, and in good faith, and has not engaged in any unfair, deceptive or otherwise unlawful conduct.

## TENTH DEFENSE

85.     Cisco reserves the right to assert any other defenses that may be revealed during the course of discovery and its investigation of Teles' claims.

## PRAYER FOR RELIEF

WHEREFORE, Cisco respectfully requests that this Court grant the following relief:

(A)     a judgment that Cisco does not infringe any valid claim of the '431 patent;

(B)     a judgment that each and every claim of the '431 patent is invalid;

(C)     a judgment that each and every claim of the '431 patent is unenforceable due to inequitable conduct;

(D)     a finding that, pursuant to 35 U.S.C. § 285, Federal Rule of Civil Procedure 11, and/or other applicable laws, this is an exceptional case that merits awarding Cisco its costs and expenses, including reasonable attorneys' fees; and

(E)      any other relief, in law or equity, to which this Court finds Cisco justly entitled.

**COUNTERCLAIMS OF CISCO SYSTEMS, INC.**

**THE PARTIES**

86.     Plaintiff Cisco Systems, Inc. ("Cisco") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 170 West Tasman Drive, San Jose, California 95134.

87.     Defendant Teles AG Informationstechnologien ("Teles"), is a foreign corporation with its principal place of business at Dovestr. 2-4, D-l 05 87 Berlin, Germany. On the face of the patent, Teles is identified as the assignee of issued United States Patent No. 7,483,431 ("the '431 Patent"), the subject of this suit.

**JURISDICTION AND VENUE**

88.     This is an action for a declaration that each claim of the '431 Patent is invalid, unenforceable and/or not infringed pursuant to the Patent Laws of the United States, 35 U.S.C. § 101, *et seq.* Accordingly, subject matter jurisdiction of this Court exists under the Federal Declaratory Judgment Act, Title 28, United States Code §§ 2201 and 2202, and under Title 28, United States Code §§1331 and 1338(a).

89.     Teles is subject to the personal jurisdiction of this Court pursuant to 35 U.S.C. § 293. Further Teles has subjected itself to the personal jurisdiction of this Court by filing the underlying infringement action against Cisco and successfully transferring Civil Action 09-cv-232, a related action, to this jurisdiction,

90.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

**FACTS**

**Pending Litigation**

28

91.    The dispute between Cisco and Teles actually began in Germany long before any litigation in the United States.  On July 23, 2004, Teles sued Cisco in Germany for allegedly infringing German Patent 196 42 063 and European Patent 0 929 884 B1.  On June 14, 2006, the German Court issued an opinion that Cisco did not infringe either patent.  Teles appealed the non-infringement decision and the appeal remains pending.

92.    Cisco responded to the infringement allegation by filing a nullity proceeding against each of the foreign patents in Germany.  Following a joint hearing in April 2006, the German court issued its official rulings and opinions on Teles' European and German patents.  In decisions dated June 2, 2006 and June 6, 2006, the court ruled that Teles' German and European patents are invalid and its claimed invention is unpatentable.  Teles appealed that decision and the appeal is pending.

93.    While the German proceedings against Cisco were pending but before the invalidity and non-infringement decisions were rendered in Germany, Teles was granted United States Patent No. 6,954,453 ("the '453 Patent") which is the United States equivalent of the German and European patents being litigated in Germany.  On October 17, 2005, just six days after issuance of the '453 patent, Teles stated in a press release that it intended "to file short term these patent violation claims in the USA, to begin with against CISCO…."  A copy of the Press Release is attached hereto as Exhibit A.

94.    Prompted by Teles' threat to sue Cisco, on October 18, 2005, Cisco filed a declaratory judgment action against Teles in the United States District Court for the District of Columbia seeking a declaratory judgment that the '453 patent was invalid, unenforceable and not infringed. The case was assigned Civil Action No. 1:05-cv-02048.

95.    On February 28, 2006, Teles filed an Answer and Counterclaim of Teles AG

Informationstechnologien to Cisco Systems, Inc.'s Original Complaint and Request for Declaratory Judgment. In its answer, Teles alleged affirmative claims that Cisco was infringing the '453 patent.

96. On December 5, 2006, United States Patent No. 7,145,902 ("'902 patent"), a divisional of the '453 patent, was issued to Teles. Teles immediately sought leave to amend its claims against Cisco pending in this Court to add the '902 Patent. Teles alleged that certain products manufactured or sold by Cisco infringed the claims of the '902 Patent.

97. Cisco filed a request for a reexamination of the '902 patent on August 8, 2007, and immediately moved for a stay of the lawsuit pending the reexamination. On August 10, 2007, Judge Walton issued an Order that Civil Action 1:05-cv-02048 "shall be temporarily stayed until this Court has resolved the plaintiff's motion to stay" pending the *Inter Partes* Reexamination of the '902 Patent. Cisco also filed a request for reexamination of the '453 patent on August 30, 2007. Both reexamination requests were granted, many of the reexamination claims were rejected as unpatentable, and the reexaminations are currently on appeal to the Board of Patent Appeals and Interferences at the Patent Office.

98. On August 29, 2008, Judge Walton issued a final Order staying Civil Action 1:05-cv-02048 pending *Inter Partes* Reexamination of the '902 Patent. Currently, all of the reexamined claims of the '453 patent stand rejected by the Patent Office, and all but two of the reexamined claims of the '902 patent were rejected by the Patent Office. The reexaminations are now on appeal to the Board of Patent Appeals. In a recent filing in the pending appeal, Teles stated that it was not contesting the rejection of 17 of the asserted claims of the '902 patent as being anticipated by the cited prior art.

**The '431 Patent**

99.     On January 27, 2009, United States Patent No. 7,483,431 issued.  The '431 patent claims to be a continuation of the '902 patent, which itself claims to be a divisional of the '453 patent.  All three of these U.S. patents (the '431, '902 and '453 patents, collectively the "three U.S. patents") are related to the European and German patents asserted in Teles' German infringement action against Cisco and in Cisco's German nullity proceeding against Teles, and all three U.S. patents claim priority to the same filings made by Teles in Germany on October 7 and 23, 1996.  All three U.S. patents share a common specification.  All three U.S. patents name the same named inventors (Messrs. Sigram Schindler, Andreas Illg, Karsten Lüdtke and Franck Paetsch).  And all three U.S. patents were assigned to Teles at the time that the lawsuit was filed.

100.     Continuing its pattern of asserting the patents in this family against Cisco, on January 29, 2009, just two days after the issuance of the '431 Patent, Teles filed suit against Cisco alleging that certain products and services manufactured by Cisco infringe the '431 Patent.

101.     At the time Teles filed the instant Lawsuit, Teles and Cisco were already parties to a lawsuit involving both the related '453 Patent and the related '902 Patent.

## REQUEST FOR DECLARATORY JUDGMENT

102.     Plaintiff incorporates by reference Paragraphs 1 through 101 as if fully set forth herein.

103.     By reason of the foregoing facts, a ripe and justiciable controversy exists between the parties regarding whether the '431 patent is valid and enforceable, and if so, whether Cisco has infringed it.  *See* Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201, 2202.

104.     Declaratory relief is necessary and appropriate in this case because the Court's judgment on the issues of patent invalidity, unenforceability and non-infringement will afford Cisco relief from the uncertainty and controversy related to assertion of infringement based on

the '431 Patent. Accordingly, Cisco asks this Court to declare that each and every claim of the

'431 Patent is invalid, not infringed and/or unenforceable.

105.    Cisco is entitled to an award of costs and expenses, including reasonable attorneys

fees, to be assessed against Teles in accordance with the provisions of 35 U.S.C. § 285 or other

statutes.

## COUNT I

### Declaratory Judgment of Non-Infringement

106.    Cisco incorporates by reference and re-alleges each and every allegation

contained in Paragraphs 1 through 105 as though fully set forth herein.

107.    Cisco has not infringed and does not infringe (either directly, contributorily or by

inducement) any valid and enforceable claim of the '431 patent.

108.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.*, Cisco

requests a declaration by the Court that it does not infringe any claim of the '431 patent either

directly or indirectly.

## COUNT II

### Declaratory Judgment Of Invalidity
### Under 35 U.S.C. §§ 101, e*t seq.*

109.    Cisco incorporates by reference and re-alleges each and every allegation

contained in Paragraphs 1 through 108 as though fully set forth herein.

110.    One or more of the claims of the '431 patent are invalid for failure to comply with

35 U.S.C. §§ 101, 102, 103 and/or 112, and the rules, regulations, and laws pertaining thereto.

111.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.*, Cisco

requests a declaration by the Court that the claims of the '431 patent are invalid.

## COUNT III

**Declaratory Judgment of Unenforceability Due to Inequitable Conduct**

112.    Cisco incorporates by reference and re-alleges each and every allegation contained in its responses to Paragraphs 1 through 111 as though fully set forth herein.

113.    The '431 patent states that it issued from U.S. Patent Application 11/456,549, which was filed on July 10, 2006.  The '431 patent is a continuation of U.S. Application No. 11/165,280, filed on June 22, 2005, now U.S. Patent No. 7,145,902 ("the '902 patent"), which is a division of U.S. Application No. 09/147,970, now U.S. Patent No. 6,954,453 ("the '453 patent"), which was filed on March 23, 1999.

114.    While the '431 patent application was still being prosecuted by Teles and its counsel in the Patent Office, on November 27, 2007, in response to a request for *inter partes* reexamination of claims 36, 37, 41, 54-58, 60-62, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90-92, 98, 100, 102, 104, and 118-125 of the '902 Patent, the Central Reexamination Unit of the Patent Office determined that a substantial new question of patentability existed with respect to each of the challenged claims and ordered reexamination.  A true and correct copy of the Order granting reexamination of the '902 patent is attached as Exhibit B hereto.

115.    On November 23, 2007, in response to a request for *ex parte* reexamination of claims 34, 36-38 of the '453 patent, the Patent Office determined that a substantial new question of patentability existed with respect to all of the challenged claims and ordered reexamination.  A true and correct copy of the Order granting reexamination of the '453 patent is attached as Exhibit C hereto.

116.    After multiple filings in the two reexaminations, while the '431 patent application was still being prosecuted by Teles and its counsel, the Central Reexamination Unit finally determined that all but two of the forty-two challenged claims of the '902 and '453 patents were

invalid and thus were finally rejected.  While the '431 patent application was still being
prosecuted, Teles filed an appeal of the rejection of certain of the '902 claims (and also
abandoned its attempt to argument that other '902 claims were patentable), and also filed an
appeal of the rejection of the '453 claims.  Cisco also filed an appeal with respect to the two '902
claims that were allowed and other issues.

117.    The '431 patent is unenforceable because Mr. Sigram Schindler, and his lead
prosecution and reexamination counsel Mr. Vincent DeLuca of Novak, Druce, DeLuca & Quigg,
LLP, acting on behalf of Teles, deliberately and knowingly withheld and/or omitted material
information in connection with the prosecution of the application which matured into the '431
patent in violation of the duty of candor to the Patent Office prescribed in 37 C.F.R. § 1.56,
including, without limitation, for the reasons set forth in Paragraphs 118 through 151 below.  The
information withheld and omitted by Mr. Schindler and Mr. DeLuca was highly material, and,
they made the following omissions with an intent to deceive the '431 examiner and the Patent
Office, as further described below.

118.    Mr. Schindler is one of the inventors of the '431 Patent, which at the time of the
prosecution was purportedly assigned to Teles AG Informations-Technologien, or Teles.  Mr.
Schindler founded Teles in 1983 and holds the position of CEO.  Mr. Schindler has been
personally involved in the litigation against Cisco, in the conduct of the reexaminations of the
'453 and '902 patents, in the drafting and submission of Teles' filings in the reexaminations, and
in the prosecution of the '431 patent application.

119.    On information and belief, Mr. Schindler is also the sole shareholder of Sigram
Schindler Beteiligungsgesellschaft mbH ("SSB"), a limited liability company, which owns 53%
of Teles.  Mr. Schindler had and has a monetary interest in the outcome of the lawsuits filed by

Teles against Cisco, and has repeatedly pursued multiple patents against Cisco in Europe and here in the United States.  In part because the U.S. District Court for the District of Columbia had stayed Teles' claims against Cisco pending the results of the '902 reexamination, Mr. Schindler had a personal and financial interest to ensure that the '431 patent would issue in the shortest time period possible so that he could begin again to actively pursue additional claims against Cisco.  To this end, he had an interest in concealing from or not disclosing the full facts and circumstances of the reexaminations to the '431 examiner, including (i) the fact that the Central Reexamination Unit in the Patent Office had repeatedly rejected essentially identical subject matter claims in the co-pending reexaminations of the '902 and '453 patents on the grounds of multiple prior art references that were also highly material and adverse to the pending '431 claims; and (ii) the fact that Teles had abandoned various of the rejected claims during the '902 reexamination and was no longer contending that the claims were patentable, including claims that contained essentially identical subject matter to the claims pending in the '431 application.

120.    Mr. DeLuca was counsel to Teles and to Mr. Schindler with respect to both the co-pending '453 and '902 reexaminations and the '431 prosecution.  He signed and filed papers in both the reexaminations and the '431 prosecution during the same time period, so he clearly had full knowledge of all the material information discussed below, including the existence and grounds for the Cisco requests for reexamination and the grounds upon which the Central Reexamination Unit found the Cisco requests to raise "substantial new questions of patentability," the scope of and basis for the multiple rejections by the Central Reexamination Unit of the '453 and '902 claims, the disclaimers, statements and arguments that Teles was making concerning the scope of the '453 and '902 claims during the reexaminations, and of

Teles' abandonment of certain unpatentable claims during the reexaminations..

121.    There is no record in the '431 patent file history that Mr. DeLuca, Mr. Schindler or anyone else acting on behalf of the applicants ever informed the '431 examiner of various highly material facts, including (i) the existence of and bases for the co-pending reexaminations of the '902 and '453 patents; (ii) the fact that the Central Reexamination Unit in the Patent Office had repeatedly rejected essentially identical subject matter claims in the co-pending reexaminations of the '902 and '453 patents; or (iii) the fact that Teles had abandoned various of the rejected claims during the '902 reexamination and was no longer contending that the claims were patentable, including claims that contained essentially identical subject matter to the claims pending in the '431 application.

122.    Counsel for Teles has alleged, but not provided any supporting evidence, documents or testimony, that in or about December 2007 "after the reexaminations of the '453 and '902 Patent were ordered, an interview in the '431 Patent application was held with Primary Examiner Afsar M. Qureshi in which the reexaminations were raised."  There is no evidence in the '431 file of such an interview, and Teles has so far refused to provide the full details of the alleged interview, such as all those who was there with Mr. DeLuca on behalf of Teles, what was said, when it occurred, precisely what was and what was not disclosed to the '431 examiner, and whether there are any corroborating documents.

123.    Nor is there any evidence in the record that the '431 patent examiner was aware of or considered the co-pending reexaminations, the prior art cited to the Central Reexamination Unit and the arguments made concerning that prior art, or the fact that the Central Reexamination Unit had repeatedly rejected similar '453 and '902 claims during his review of the '431 patent application.

124.    Teles and Mr. DeLuca and his law firm have also intentionally blocked and refused to answer discovery requests and provide any information, documents or testimony concerning any communications with the '431 examiner regarding the reexaminations.

125.    For the reasons stated herein, Mr. Schindler and Mr. DeLuca knowingly failed to disclose highly material facts to the '431 examiner, with an intent to deceive the examiner into allowing claims in the '431 application that were otherwise unpatentable without consideration of the reexaminations and the results of those reexaminations.

126.    Neither Mr. Schindler nor Mr. DeLuca ever provided the '431 examiner any copies of the Cisco reexamination filings, the decisions of the Central Reexamination Unit granting reexaminations of the '902 and '453 patents, the office actions of the Central Reexamination Unit, the briefs and papers filed by Teles and by Cisco addressing the unpatentability of the claims and the grounds for rejecting the claims, or the papers of Teles in which Teles abandoned its efforts to overcome the Central Reexamination Unit's rejection of certain claims of the '902 patent.

127.    Cisco further states that during both the *inter partes* and *ex parte* reexaminations, Mr. DeLuca and also litigation counsel for Teles, the Howrey firm, were served with copies of the entire reexamination record, so they had the information and could have easily disclosed it to the '431 examiner, but deliberately chose not to do so.

128.    The omitted and withheld information is highly material at least in part because the claims of the '431 Patent are substantially similar to, overlap, and are obvious variants of, the claims that the Patent Office rejected in the '453 and '902 reexamination proceedings.  Generally speaking, the Teles patents are directed to the routing of telephone calls or data transmission by switches that provide connections to either a circuit switched network (an example of which is

the "public switched telephone network" or "PSTN") or to a "packet switched" network such as

the Internet.  The patents refer to dynamically switching an ongoing call from a packet network

to a switched network during the call, without interrupting the connection between the sender

and receiver.  The '431 Patent asserts claims based on the same kind of devices, using a "mobile

packet switched network."  The claims of the '431 Patent are obvious variants of the reexamined

claims of the '453 and '902 patents, as was confirmed by the '431 Patent Examiner during an

interview with Mr. DeLuca that was conducted on September 30, 2008.

129.    For example, claim 36 of the '902 patent, which was rejected by the Patent Office

during the '902 reexamination as anticipated by the prior art, and which Teles subsequently

abandoned in the reexamination, is identical to claim 46 in '431 patent with the exception of

referring to a "mobile packet switching network" rather than a "packet switching network," as

shown in the following chart:

| '902 Patent, Claim 36 | '431 Patent, Claim 46 |
| --- | --- |
| A method for transferring data selectively by line switching or by packet switching from a first switch to a second switch, the first switch being part of or having access to a line-switching network and a packet switching network, comprising: | A method for transferring data selectively by line switching or by packet switching from a first switch to a second switch, the first switch being part of or having access to a line-switching network and a mobile packet switching network, comprising: |
| packetizing the data into data packets in the first switch if the data does not yet exist as data packets | packetizing the data into data packets in the first switch if the data does not yet exist as data packets; |
| transferring the data packets from the first switch through the packet-switching network to the second switch | transferring the data packets from the first switch through the mobile packet-switching network to the second switch; |
| checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching connection to the second switch, wherein the control signal is produced by a network | checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the mobile packet switching network to a line-switching connection to the second switch, wherein the control signal is produced by a network |

| '902 Patent, Claim 36 | '431 Patent, Claim 46 |
|---|---|
| management system | management system; |
| establishing the line-switching connection through the line-switching network to the second switch in response to said control signal, if the line-switching connection is not yet present; and | establishing the line-switching connection through the line-switching network to the second switch in response to said control signal, if the line-switching connection is not yet present; and |
| changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching data transfer in response to said control signal and transferring data over the line switching connection to the second switch. | changing-over from the packet-switching data transfer of the data packets through the mobile packet switching network to a line-switching data transfer in response to said control signal and transferring data over the line switching connection to the second switch. |

130.    Another of the claims rejected by the Patent Office – claim 34 of the '453 patent – also contains essentially identical language as that in claim 45 of the '431 patent, and claim 45 is an obvious variant of claim 34 of the '453 patent, as shown in the following chart:

| '453 Patent, Claim 34 | '431 Patent, Claim 45 |
|---|---|
| Switching apparatus for routing a telephone call comprising non-packetized data from a first end terminal located at a user's premises to a second end terminal located at another user's premises, selectively by line switching or packet switching, the switching apparatus comprising: | Switching apparatus for routing a telephone call from a first end terminal to a second end terminal, selectively by line switching or packet switching, the switching apparatus comprising |
| means for establishing a connection through a line-switching network to the second end terminal | means for establishing a connection through a line-switching network to the second end terminal; |
| means for line-switching transferring data received from the first end terminal as non-packetized data over the line-switching network to the second end terminal | means for line-switching transferring data received from the first end terminal over the line-switching network to the second end terminal; |
| means for establishing a connection through a packet-switching network to the second end | means for establishing a connection through a mobile packet-switching network to the second |

| '453 Patent, Claim 34 | '431 Patent, Claim 45 |
| --- | --- |
| terminal | end terminal; |
| means for packet-switching transferring data received from the first end terminal as non-packetized data over the packet-switching network to the second end terminal; and | means for packet-switching transferring data received from the first end terminal over the mobile packet-switching network to the second end terminal; and |
| means responsive to a control signal for transferring to a line-switching transfer or a packet-switching transfer to the second end terminal; said means responsive to a control signal changing-over to a line-switching data transfer or a packet-switching transfer during the existing transfer with the presence of said control signal. | means responsive to a control signal for transferring to a line-switching transfer or a packet-switching transfer to the second end terminal; said means responsive to a control signal changing-over to a line-switching data transfer or a mobile packet-switching transfer during the existing transfer with the presence of said control signal. |

131. The claims of the newly asserted '431 patent thus clearly overlap with and are obvious variants of the claims of the Teles' '453 and '902 patents that were rejected by the Central Reexamination Unit as unpatentable during the reexaminations and, as to some of the claims, which Teles itself abandoned during the reexaminations. The existence of the reexaminations, the detailed grounds for invalidity asserted by Cisco and adopted by the Central Reexamination Unit in the reexamination proceedings, the fact of the Central Reexamination Unit's rejection of the claims and its reasoning for such rejections and the art it relied upon, and the fact of Teles' abandonment of certain claims, constitute highly material and noncumulative information with respect to the patentability of the claims of the '431 Patent. Furthermore, the contents of both the Cisco submissions and the Examiner's office actions and rejections also constitute highly material information in that they contained detailed information for each limitation on a claim-by-claim basis as to why the claims were invalid as anticipated or obvious.

132. For example, the Central Reexamination Unit found that Focsaneanu, U.S. Patent No. 5,610,910 ("Focsaneanu") raised a substantial new question of patentability with respect to

multiple other claims from the '902 patent under reexamination.  A true and correct copy of Focsaneanu is attached as Exhibit D hereto.

133.    On November 27, 2007, the Central Reexamination Unit issued a detailed Office Action rejecting claim 36 (and other claims) based on Focsaneanu.  A true and correct copy of the Office Action, which is incorporated by reference herein, is attached as Exhibit B hereto. Beginning at page 4 of the Office Action, the Central Reexamination Unit explained the relevance of Focsaneanu to each limitation of claim 36 and provided citations to where in the reference the pertinent information was found.  *See id.* at 4-10 (office action).

134.    As stated above, claim 36 of the '902 patent is identical to claim 46 in '431 patent with the exception of referring to a "mobile packet switching network" rather than a "packet switching network."  The additional limitation of a "mobile packet switching network" is specifically disclosed in Focsaneanu.  For example, Focsaneanu discloses the use of telephones and wireless communication devices (e.g., a mobile phones) that can carry out packet-switching connections over either a line-switching network (the PSTN) and a data-switching network (e.g., the Internet). *See* FIG. 2 and col. 2:10-15 ("FIG. 2 also shows a wireless connection.  For wireless service, the CPE is connected through the wireless interface or CPE connector 40 and a radio frequency channel 52 to a base station or access module 42, and then to the wireless services provider who in turn provides a connection to the specific service or transport network such as PSTN 54."); *see also* col. 3:56-59, col. 4:42-45 and 58-64, and col. 7:10-15.  A claim chart comparing claim 46 of the '431 patent as compared with Focsaneanu is attached as Exhibit E hereto.  Focsaneanu anticipates or renders obvious claim 46 of the '431 patent.

135.    On November 23, 2007, the  PTO issued an order granting an *ex partes* reexamination  of claims 34-36 and 38 of the '453 patent.  A true and correct copy of the Order

is attached as Exhibit C hereto.  The PTO found a substantial new question of patentability affected each of these claims.  The Central Reexamination Unit, as with the '902 patent, also found that Focsaneanu raised a substantial new question of patentability with respect to claim 34 of the '453 patent.  *See id.* at 6-8.

136.    As stated above, claim 34 of the '453 patent is substantially the same as claim 45 of the '431 patent.

137.    A claim chart comparing claim 45 of the '431 patent as compared with Focsaneanu is attached as Exhibit E hereto.

138.    There is no record, however Mr. Schindler or Mr. DeLuca – who had direct knowledge of and participation in the reexaminations, since they were drafting and signing Teles' filings and were receiving Cisco's filings and the Office Actions that rejected the '453 and '902 claims – ever disclosed the reexaminations to the '431 examiner.  They continued to conceal material facts concerning the '453 and '902 reexaminations even after the '431 examiner requested a terminal disclaimer from Teles during the '431 prosecution on the ground that the pending '431 claims were unpatentable as obvious variants of the claims in the earlier patents.

139.    It was clear to Mr. Schindler and Mr. DeLuca at the time of this request that the '431 examiner considered the '431 claims to be obvious variants of the '453 and '902 claims and thus not patentable in light of claims that Mr. Schindler and Mr. DeLuca knew had already been rejected as invalid in the '902 and '453 reexaminations.  But rather than disclose any information to the '431 examiner concerning the status of the reexaminations and or the unpatentability of the '453 and '902 claims, Mr. DeLuca and Mr. Schindler chose instead simply to submit a terminal disclaimer, without making any disclosure at all about the reexaminations or the status of the '453 and '902 claims.  They made this decision to omit all the material information about the

42

reexaminations and not disclose it to the '431 examiner with an intent to deceive the '431 examiner into thinking that the '431 claims were also patentable and to speed the issuance of the '431 patent.  In addition, Mr. Schindler and Mr. DeLuca intentionally failed to disclose to the '431 examiner that Teles itself had abandoned as unpatentable multiple '902 patent claims, including '902 claim 36 which was substantively identical and an obvious variant to at least one of the pending '431 claims.

140.    Mr. Schindler and Mr. DeLuca also concealed from the '431 examiner that Teles had made repeated explicit statements to the Central Reexamination Unit regarding the narrow scope of claim language from the '453 and '902 claims that was also contained in the '431 claims then being examined.  The material statements that Teles had made during the reexamination included statements and disclaimers to the effect that each of the claims at issue in the '902 reexamination (including claims that contained language referring to a change-over occurring "without interruption of a call set-up procedure") were limited to a change-over between different types of switching during a real-time, end-terminal-to-end-terminal data transfer, without interruption of the ongoing connection.  *See e.g.,* Owner's Response filed 5/2/08 at pages 8, 11, and 20-22.  A true and correct copy of the Owner's Response filed on May 2, 2008 is attached as Exhibit F hereto.

141.    The '431 examiner – if Mr. Schindler and Mr. DeLuca had disclosed the existence, substance, and results of the reexaminations, as well as the reasoning and arguments of both parties and of the Central Reexamination Unit – would have considered such information concerning the clear invalidity of the subject matter of the claims before him, as revealed by the reexaminations, highly important to the patentability of the '431 claims and would have stopped, or at a minimum delayed, the issuance of the '431 patent, and/or forced Teles to amend its

43

proposed '431 patent claims.  There is no record in the '431 patent file history that the examiner
was aware of any information about the reexaminations or that he considered it during his review
of the proposed '431 claims.

142.    Mr. Schindler's and Mr. DeLuca's failure to disclose material information to the
examiner of the '431 patent was done knowingly and intentionally, and with intent to deceive the
examiner and the Patent Office into quickly issuing a new patent to be asserted against Cisco,
even though the '431 claims were not patentable or were at a minimum subject to substantial
questions about their validity.  Notably, at the time of the alleged inequitable conduct by Mr.
Schindler and Mr. DeLuca, the prior litigation against Cisco based on the '453 and '902 patents
had been indefinitely stayed by Judge Walton in the District of Columbia pending the resolution
of the '902 reexamination.  At the time the '431 application was being pursued by Mr. Schindler
and Mr. DeLuca, they both knew that the asserted claims of the '453 and '902 patents either
stood rejected, abandoned, or on appeal, and thus that they could very well be left with no claims
against Cisco, if and when the stayed litigation finally resumed.  During this time, Teles
repeatedly argued to Judge Walton that time was of the essence in the litigation between Cisco
and Teles due to Teles' inability to penetrate the United States VoIP market occupied by Cisco
and others.  Mr. Schindler and his attorney Mr. DeLuca had every incentive into deceiving the
'431 examiner into allowing the '431 claims quickly, so that they could assert a new lawsuit
against Cisco in a different jurisdiction where no stay would be pending.  In fact, that is what
Teles and Mr. Schindler decided to do just two days after '431 patent issued, filing the instant
case in Delaware rather than the District of Columbia where litigation between the same parties
had been pending since October 2005.

143.    The material information that Mr. Schindler and Mr. DeLuca withheld is

expressly required to be disclosed by the Code of Federal Regulations and the Manual for Patent

Examining Procedure ("MPEP"). The relevant information withheld from the '431 examiner

includes: (i) the status and details of the litigation *Cisco Systems, Inc. v. Teles AG*

*Informationstechnologien* (Civil Action No. 1:05-CV-02048 (RBW)) (D. D.C.) [now transferred

to this Court as Civil Action No. 09-232], in which the '453 and '902 patents are currently at

issue, as required by 37 C.F.R. § 1.56 and MPEP § 2001.06(c), as well as particularly the

interrogatory responses of Cisco in that litigation which identified in detail numerous prior art

references and set forth the reasons (including detailed claim charts for multiple references) why

the claims of the '453 and '902 Patents were invalid in light of the prior art; and (ii) the

existence, details, reasoning and status of the ongoing reexamination proceedings for both the

'902 and '453 patents, as required by 37 C.F.R. § 1.56 and MPEP § 2001.06, including without

limitation the submissions of Cisco and Teles, as well as the findings by the reexamination

examiners that rejected the substantially similar claims in those reexaminations.

144.    These non-disclosed materials are clearly material to patentability. The Patent

Office itself found the references cited in the reexaminations to have raised "substantial new

questions of patentability" and to also provide grounds for rejecting claims that had been

previously issued, which have essentially the same scope as the issued claims of the '431 patent,

which the '431 examiner himself concluded were just obvious variants of the '453 and '902

claims. The substantial new questions of patentability that the Patent Office determined on

reexamination existed for the '453 and '902 claims were based on references that included U.S.

Patent No. 5,610,910 to Focsaneanu, U.S. Patent No. 6,137,792 to Jonas, U.S. Patent No.

5,732,078 to Arango, U.S. Patent No. 4,996,685 to Farese, U.S. Patent No. 5,598,411 to

Matsukawa, U.S. Patent No. 5,347,516 to Yoshida, U.S. Patent No. 6,069,890 to White, and

"Lucent Technologies announces Internet telephone servers to put voice, fax and voice mail on the Internet," *Lucent Technologies*, September 17, 1996.  The Patent Office relied upon each of these references in rejecting one or more of the reexamined claims of the '453 or '902 patents on grounds of either anticipation or obviousness, including claim 36 of the '902 patent and claim 34 of the '453 patent which are virtually identical to claims 46 and 45 respectively of the '431 patent.

145.     Mr. Schindler and Mr. DeLuca, however, intentionally and with intent to deceive failed to disclose to the '431 examiner, at least that the '431 claims then being considered by the examiner were obvious variants of '902 and '453 claims that had been rejected by the Central Reexamination Unit, and they also failed to disclose the reasoning adopted by the Central Reexamination Unit, as well as the detailed information contained in the Cisco filings and in the reexamination office actions detailing the relevant portions of the cited references.

146.     By definition, the U.S. Patent Office has determined that the '453 and '902 reexaminations raised substantial **new** questions or patentability, so the information submitted, and the resulting rejections by the Central Reexamination Unit, were by definition not cumulative of any prior information before the '431 examiner.

147.     Even after the Patent Office finally rejected all but two of the challenged claims of the '902 and '453 patents as invalid, Teles, Mr. Schindler and Teles' counsel, Mr. DeLuca, still failed to disclose to the '431 examiner Cisco's arguments concerning this prior art (and other art disclosed in interrogatory responses during the litigation), the existence of the reexaminations, the contents of the parties filings in the reexamination, or the findings of the examiners during the reexaminations.  On September 30, 2008, Mr. DeLuca even held a meeting with the '431 examiner regarding the '431 patent application, after the rejection of the claims in

46

the '453 and '902 patents during the reexaminations, but still failed to disclose the reexaminations and/or the grounds for the rejections to the '431 examiner.  Without knowing this highly material information, the examiner issued a notice of allowance on October 23, 2008, in which he indicated that the claims were allowable over the closest prior art.  The only art that the '431 examiner identified in the statement of reasons for allowance were U.S. Patent No. 6,574,216 to Farris et al. and U.S. Patent No. 5,852,721 to Dillon et al., and this citation was made without the benefit of having seen the reexamination materials or having considered the substantial new questions that were raised by the reexamination, or having considered the detailed reasoning prepared by the Reexamination Examiner in rejecting virtually identical claims.

148.    As of at least October 3, 2008, twenty days before the notice of allowance was issued, Teles, Mr. Schindler, and Teles' counsel, Mr. DeLuca, also knew that the Patent Office had rejected all but two of the challenged claims of the '453 and '902 patents as either anticipated or obvious.  Nonetheless, upon information and belief, Mr. Schindler and Mr. DeLuca knowingly and intentionally failed to disclose this material information to the '431 examiner, and allowed then-pending claims that were substantially similar and overlapping, if not identical in substance, to proceed to issuance.  Teles' counsel during the reexaminations, moreover, was the same counsel that was prosecuting the application that issued as the '431 patent.

149.    At the time that the '431 patent issued on January 27, 2009, there was no record in the file history of the existence of the co-pending reexaminations of '453 and '902 patents or that the Central Reexamination Unit of the Patent Office had repeatedly and finally rejected those claims as being anticipated or rendered obvious by multiple pieces of prior art.  Nor was there

any record in the file history that the examiner was made aware of any of this information.

150.    Teles does not contend that the '431 patent file history has a record that the examiner was informed about the existence of the co-pending reexaminations of '453 and '902 patents or that the Central Reexamination Unit of the Patent Office had repeatedly and finally rejected those claims as being anticipated or rendered obvious by multiple pieces of prior art.

151.    Upon information and belief, Teles, Mr. Schindler, and their counsel, Mr. DeLuca, deliberately and knowingly withheld and/or omitted material information in connection with the prosecution of the '549 application, which matured into the '431 patent, in violation of the duty of candor to the Patent Office prescribed in 37 C.F.R. § 1.56.  Such conduct constitutes inequitable conduct that renders the '431 patent unenforceable.

## COUNT III

### Declaratory Judgment of Unenforceability Due to Infectious Inequitable Conduct

152.    Cisco incorporates by reference and re-alleges each and every allegation contained in its responses to Paragraphs 1 through 151 as though fully set forth herein.

153.    The '431 patent is also unenforceable due to infectious inequitable conduct in the prosecution of the related '453 and '902 patents before the Patent Office by Mr. Sigram Schindler and prosecuting attorneys Messrs. D. Bruce Prout and Richard Paciulan, then of the law firm Christie, Parker & Hale LLP.  Acts constituting such inequitable conduct include, without limitation, at least those set forth in Paragraphs 154 through 169.   The information withheld and omitted by Mr. Schindler and Messrs. Prout and Paciulan was highly material, and, they made each of the following omissions with the intent to deceive the '453 examiner and the Patent Office as further described below.

154.    The '453 patent states that it was based upon U.S. Patent Application Serial No.

48

09/147,970 ("the '970 application"), which was filed on March 23, 1999 ("the '970 filing date"). The '453 patent further identifies the '970 application as claiming priority from international application PCT/DE97/02363 (the "PCT application"), which is identified as filed under the provisions of the Patent Cooperation Treaty on October 7, 1997 (the "PCT filing date").  The PCT application claims priority from two applications identified as being filed in Germany:  DE 196 42 063 (the "DE '063 application"), identified as being filed on October 7, 1996; and DE 196 45 368 (the "DE '368 application"), identified as being filed on October 23, 1996.  These applications also were cited by Teles as priority for a European Patent, No. EP0929884 B1 (the EP '884 patent).

155.    The '453 patent identifies Messrs. Sigram Schindler, Andreas Illg, Karsten Lüdtke and Franck Paetsch as named inventors.  Mr. Schindler founded Teles in 1983, has remained with the company since its founding and is presently its Chief Executive Officer.

156.    Prior to the issuance of the '453 patent, Quintum Technologies, Inc. ("Quintum") challenged the EP '884 patent in a nullity action filed in Germany (the "Quintum nullity").  The complaint in the Quintum nullity cited and described in detail material prior art references and systems.  Both the contents of the Quintum nullity complaint and the cited prior art references themselves from that filing were not disclosed to the PTO during the prosecution of the '970 application, including:

- TAXI System, User Manual, Manual Version 2.0 (English Version), December 1995 (the "TAXI reference");

- IDB 64/2, Benutzer-Handbuch, Software Release 4.11, March 1996;

- Hans-Jochen Schneider, Lexikon der Informatik und Datenverarbeitung, 2d ed., 1986;

- Manu Malek, Integrated Voice and Data Communications Overview, IEEE Communications Magazine, vol. 26, no. 6, June 1988;

- Claude Wacker, Interconnection of LANs using ISDN, 2nd Joint European Networking Conference, May 1991;

- Vocaltec Introduces The Internet Phone Telephony Gateway Linking Traditional and Internet Telephone Networks, Press Release, March 8, 1996;

- Vocaltec Links Phones to Web, Discount Long Distance Digest News, August 2, 1996;

- NetWare MultiProtocol Router for ISDN 3.1 Installation and ISDN Configuration Guide, 1996;

- Telefonieren auf dem Novell-Netz, LANline, February 1995;

- LAN und TK-Funktionen wachsen zusammen, LANline, July 1995;

- Das LAN wird zur Telefonanlange, ntz, vol. 4/1995;

- Realisierung von LAN-Diensten über TK-Anlagen, ntz, vol. 12/1992;

- Christian J. Jenny and Karl Kümmerle, Distributed Processing Within an Integrated Circuit/Packet-Switching Node, IEEE Transactions on Communication, vol. Com-24, no. 10, October 1976**;**

- Gino J. Coviello and Robert E. Lyons, Conceptual Approaches to Switching in Future Military Networks, IEEE Transactions on Communication, vol. Com-28, no. 9, September 1980**;**

- Brij Bhushan and Holger Opderbeck, The Evolution of Data Switching for PBX's, IEEE Journal on Selected Areas in Communication, vol. Sac-3, no. 4, July 1985;

- Tohru Kohashi, et al., Integrated Circuit and Packet Switching Applications to a Loop System for Local Area Networks, IEEE Journal on Selected Areas in Communication, vol. Sac-3, no. 4, July 1985;

- Mark J. Karol and Michael G. Hluchyj, Using a Packet Switch for Circuit-Switched Traffic: A Queuing System with Periodic Traffic Input, IEEE Transactions on Communication, vol. 37, no. 6, June 1989; and

- William Stallings, ISDN and Broadband ISDN with Frame Relay and ATM, 3d ed., April 1995.

157. Mr. Schindler was involved in the Quintum nullity action and was aware of the references cited therein, because he or his attorneys were served with a copy of Quintum's

nullity complaint and because Mr. Schindler was personally involved in the nullity proceedings.

158.    Upon information and belief, Mr. Prout and Mr. Paciulan were also aware of the references as well, before the issuance of the '453 patent.

159.    For reasons that include those enumerated in the Quintum nullity complaint, the prior art disclosed below is material to the patentability of the '453 patent, which is a counterpart of the patent challenged in Europe.  The references should have been disclosed to the PTO during the prosecution of the '970 application prior to the issuance of the '453 patent on October 11, 2005.

160.    The references were material to at least Claims 1-4, 21-24, 26 and 34 of the '453 patent.  For example, independent claim 1 of the European patent challenged in the Quintum nullity action is materially the same as Claim 21 later allowed in the '453 patent.

| Claim 1 of EP0929884 | Claim 21 of US Patent No. 6,954,453 |
|---|---|
| A method for transmitting data from a first switch to a second switch, | A method for transferring data from a first end terminal to a second end terminal, |
| which are components of a line-switching network or have access to a line-switching network, | |
| either by line-switching or by packet-switching, consisting of the following steps: | selectively by line-switching or packet switching, comprising: |
| a) formation of a connection over the line-switching network from the first switch to an access point of a packet-switching network, | a) establishing a connection through a line-switching network from the first end terminal to an access point of a packet switching network; |
| b) line-switching transmission of the data from the first switch to the access point of the packet-switching network, | b) line-switching transferring of non-packetized data through said connection from the first end terminal to the access point of the packet-switching network; |
| c) packeting the data if it is not already in data packets, | c) packeting of the data into data packets |
| and packet-switching transmission of the data | and packet-switching transferring of the |

| | |
|---|---|
| packets over the packet-switching network from the access point to the second switch, | data packets through the packet-switching network from the access point to the second end terminal; |
| d) repeated checking whether there is a control signal for transfer to a line-switching connection to the second switch, | d) checking repeatedly whether a control signal exists for transferring to a line-switching connection to the second end terminal; |
| whereby this signal is emitted by the user of an end device or a network management, | |
| e) formation of a line-switching connection from the first switch to the second switch over the line-switching network when there is a corresponding control signal if such a line-switching connection does not already exist, | e) establishing the line-switching connection, during an existing transfer, through the line-switching network from the first end terminal to the second end terminal with a presence of the control signal, if the line-switching connection is not yet present; and |
| f) changing to line-switching data transmission during the existing connection | f) changing-over to a line-switching data transfer during the existing transfer |
| and transmission of the data to the second switch. | and transferring data over the line-switching connection to the second end terminal. |

161. For example, and without limitation, various references, including the prior art documents "Taxi System, User Manual Version 2.0" December 1995," and "IDB-64/2 Benutzerhandbuch" were highly material to the claims of the '453 patent because they disclose in the prior art that the method of, e.g., Claim 21 of the '453 patent, was known in the art through publications and already being practiced in Germany in one or more commercial devices.

162. These references, and others described in the Quintum nullity complaint, disclose for example, that the TAXI system in use as of late 1995 had an "intelligent" back-up function, in which a packet-switched data link between two switches is constantly monitored, and if the link fails, the TAXI system automatically establishes a back-up line-switched connection so as to enable the system to change over to the line-switching back-up connection during the ongoing transfer of data between the switches.

163.    Such a reference was material because it was not cumulative of the references already cited and it would have anticipated or rendered obvious at least Claim 21 of the '453 patent, which was allowed by the U.S. patent examiner after the existence of the Quintum nullity references were concealed from the examiner.  A chart showing Claim 1 of the European patent challenged in the Quintum nullity action in a first column, the similar elements of Claim 21 of the '453 patent in a second column, and the disclosure of the TAXI reference that incorporates each element of those claims in a third column, which disclosure was set out in the Quintum nullity complaint, is attached as Exhibit G.  The TAXI reference was not cumulative information at least because the TAXI reference is anticipatory and the Patent Office during the '453 examination did not find any of the cited references to be anticipatory of the claims as finally issued.

164.    Mr. Paciulan and Mr. Prout (collectively the "Christie attorneys") and/or Mr. Schindler, all acting on behalf of Teles, deliberately and knowingly and with an intent to deceive the Patent Office withheld these material references in violation of the duty of candor to the PTO prescribed in 37 C.F.R. § 1.56.

165.    Although Quintum had provided notice of these references to Teles and Mr. Schindler in or about July 2005, and although Mr. Schindler was personally participating in both the response to the Quintum nullity action and in the simultaneous prosecution of the '453 application, Mr. Schindler either withheld the references from his U.S. attorneys or Mr. Schindler and the Christie attorneys made a deliberate decision not to disclose them to the '453 examiners so as to cause the examiner to allow the '453 patent to issue with invalid claims, including Claim 21.  At no time  prior to the issuance of the '453 patent did Mr. Schindler or the Christie attorneys disclose the above references or the Quintum nullity action and the detailed

discussion of the materiality of those references in the nullity action to the U.S. patent examiners for the '453 patent.

166.    Indeed, Mr. Schindler and the Christie attorneys (who were attorneys of record for the '902 application and prosecution counsel from at least the filing of Application No. 11/165,280 on June 22, 2005 until February 9, 2006, when they were replaced by Mr. Vincent DeLuca and the firm of Novak Druce DeLuca & Quigg LLP), continued to withhold the above references and the existence of the Quintum nullity action from the U.S. examiners of the '902 patent as well.  It was not until the filing of an IDS on or about March 20, 2006, that the references were submitted by the Novak Druce firm to the examiners during the '902 prosecution.  The belated submission of these references during the '902 prosecution, which occurred only after the '453 patent had issued, is confirmation that the references were known to Mr. Schindler from at least the date of the Quintum nullity complaint, yet had been withheld from the U.S. examiners during the '453 examination.

167.    The '902 patent identifies itself as issuing from U.S. Patent Application Serial No. 11/165,280 (the "'280 application), which was filed on June 22, 2005 (the "'280 filing date").  The '902 patent further identifies the '280 application as a division of the '970 application.  The '431 patent identifies itself as issuing from U.S. Patent Application Serial No. 11/456,549 (the "'549 application"), which was filed on July 10, 2006 (the "'549 filing date").  The '431 patent further identifies the '549 application as a continuation of the '280 application.

168.    The violation of the duty of candor by the applicants and/or individuals acting on behalf of the applicants bears an "immediate and necessary relation" to the '902 and '431 patents and the claims thereof, and therefore renders the '902 and '431 patents unenforceable under the doctrine of infectious unenforceability.  The '431 examiner requested a terminal disclaimer from

Teles on the grounds that the pending '431 claims were unpatentable as obvious variants of the '902 claims. Similarly, the '902 examiner rejected all claims of the '902 patent as being obvious variants of the '453 claims, and also required a terminal disclaimer in order to allow issuance of the '902 claims. All of the asserted claims in the '431, '902 and '453 patents were already considered by the Patent Office to claim nothing more than obvious variations of a certain invention.

169.    Disclosing the references withheld during the prosecution of the '970 application during the prosecution of the '280 application cannot cure the applicants' violation of the duty of candor during the prosecution of the '970 application and its infection of the '280 and '549 applications.

## PRAYER FOR RELIEF

WHEREFORE, Cisco respectfully requests that this Court grant the following relief against Teles:

A.    A declaration that all claims of the '431 Patent are invalid;

B.    A declaration that Cisco does not infringe any of the claims of the '431 Patent;

C.    A declaration that the '431 patent is unenforceable;

D.    A finding that, pursuant to 35 U.S.C. § 285, and/or other applicable laws, this is an exceptional case that merits awarding Cisco its costs and expenses, including reasonable attorneys' fees; and

E.    An award to Cisco of any other relief, in law and in equity, as the Court deems just and proper under these circumstances.

## DEMAND FOR JURY TRIAL

Cisco demands a trial by jury of all claims and issues so triable.

Respectfully submitted,

Dated:  September 14, 2009

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____  (#3778)
Jack B. Blumenfeld (#1014)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
*Attorneys for Cisco Systems, Inc.*

OF COUNSEL:
J. Anthony Downs
Lana S. Shiferman
GOODWIN PROCTER LLP
53 State Street
Boston, MA  02109
(617) 570-1000
jdowns@goodwinprocter.com
lshiferman@goodwinprocter.com

56

# EXHIBIT A

## Ad hoc Release

**TELES: VoIP-Patent now granted also in the USA**

Berlin, 17th October 2005.   This information is released in accordance with § 13 section 1 and § 15 section 1 of the German Investor Protection Improvement Act (AnSVG).

The US Patent authority just granted, on 11.10.2005, to TELES the patent US 6,954,453 B1 (see www.teles.de). It is the lightly changed analogue to the German and European "IntraStar patents", the invention/registration of which goes back to the year 1996, the legal protection for Germany and Europe of which therefore holds on until 2016 — unless one of the invalidity allegations against them should succeed, which TELES considers to be utmost unlikely (see www.teles.de again) — and which guarantee "secure " VoIP telephony: Namely, by enabling the "quality insecure pure packet switching" Internet telephony technology fall backs at any times to "quality secure pure line switching" classic telephony technology, as deemed reasonable due to quality reasons.

Based on these German and European patents, TELES has filed patent violation suites against the respective products by AVM, Quintum and CISCO in Germany, in a first step (see also www.teles.de) — and will expand at least the two latter legal cases to the whole European market as well as to all the other concerns on them, which are active in VoIP technology. In total, this is more than a dozen of well-known companies operating worldwide and in Europe in particular. Most of them are based in the USA and may now be legally attacked also on their home market, because of violating TELES' patent since 1996/97.

TELES intends to file short term these patent violation claims in the USA, to begin with against CISCO and Quintum again, but here (unlike in the German/European trials with only the method claims 1 and 2 as basis) also out of the apparatus claim 34 — which simplifies in the USA the proof of patent violation.

Professor Sigram Schindler
    CEO of TELES AG


© TELES AG

# EXHIBIT B

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

BRYAN COOPER
GOODWIN PROCTER LLP
EXCHANGE PLACE
BOSTON, MA 02109

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/001,001*.

PATENT NUMBER *7,145,902*.

TECHNOLOGY CENTER *3999*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev.07-04)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/001,001 | 09/07/2007 | 7,145,902 | |

NOVAK DRUCE & QUIGG, LLP
1300 EYE STREET NW
SUITE 1000 WEST TOWER
WASHINGTON DC 20005

| EXAMINER |
|---|
| |

| ART UNIT | PAPER |
|---|---|
| | |

DATE MAILED:

11/27/07

# *INTER PARTES* REEXAMINATION COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this communication.

PTOL-2071 (Rev.07-04)

| ORDER GRANTING/DENYING REQUEST FOR INTER PARTES REEXAMINATION | Control No. 95/001,001 | Patent Under Reexamination 7,145,902 |
|---|---|---|
| | Examiner Ovidio Escalante | Art Unit 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):     ☐ PTO-892     ☒ PTO/SB/08     ☒ Other: <u>Decision</u>

1. ☒ The request for *inter partes* reexamination is GRANTED.

    ☒ An Office action is attached with this order.

    ☐ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

| *OFFICE ACTION IN INTER PARTES REEXAMINATION* | Control No. 95/001,001 | Patent Under Reexamination 7,145,902 | |
|---|---|---|---|
| | Examiner Ovidio Escalante | Art Unit 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on _____

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response:*
    2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II.  SUMMARY OF ACTION:**

1a. ☒ Claims <u>See Continuation Sheet</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims <u>See Continuation Sheet</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____   ☐ are acceptable   ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:   ☐ approved.   ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
       ☐ been received.   ☐ not been received.   ☐ been filed in Application/Control No <u>95001001</u>.
10. ☐ Other _____

**Continuation Sheet (PTOL-2064)**                                          **Control No. 95/001,001**

Continuation of SUMMARY OF ACTION: 1a. Claims subject to reexamination are 36,37,41,54-58,60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125.

Continuation of SUMMARY OF ACTION: 5. Claims rejected are 6,37,41,54-58,60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125.

Application/Control Number: 95/001,001                                                    Page 2
Art Unit: 3992

## DECISION GRANTING *INTER PARTES* REEXAMINATION

1.       A substantial new question of patentability affecting claims 36,37,41,54-58,60-

62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of United States

Patent Number 7,145,902 (Schindler et al. patent) is raised by the request for *inter partes*

reexamination.

         This decision is in response to the corrected request for *inter partes* reexamination filed

on September 7, 2007 and the decision vacating *inter partes* reexam entered on November 8,

2007 which vacated the decision granting *inter partes* reexamination order mailed on November

5, 2007 for incorrectly noting that the prior art references that were relied upon in the request

were not cited during the prosecution of the Schindler et al. patent.

2.       The instant patent issued December 5, 2006 based on US Patent Application Ser. No.

11/165,280, filed June 2, 2005 as a division of application No. 09/147,970 field as application

No. PCT/DE97/02363 on October 7, 1997.

### *References Cited in the Request*

3.       The Request identifies the following printed publications as providing teachings relevant

to the claims of the '902 Schindler patent

         Farese U.S. Patent 4,996,685

         Focsaneanu U.S. Patent 5,610,910

         Jonas U.S. Patent 6,137,792

         "Lucent Technologies announces Internet telephony servers to put voice, fax and voice
         mail on the Internet," *Lucent Technologies,* September 17, 1996, (hereinafter Lucent
         Press Release).

         Matsukawa U.S. Patent 5,598,411

Application/Control Number: 95/001,001                              Page 3
Art Unit: 3992

Yoshida U.S. Patent 5,347,516

Arrango US Patent 5,732,078

### *Detailed Explanation of How the Cited Prior Art is Applied to Every Claim for Which Reexamination is Requested.*

Issue 1:     Focsaneanu US Patent 5,610,910 is asserted as rendering claims 36,37,54-58, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90-92,95,98,100,102,104,118-120,122-125 anticipated.

Issue 2:     Jonas US Patent 6,137,792 is asserted as rendering claims 36,37,54,55,60, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98,100,102,118,120-124 anticipated.

Issue 3:     Farese US Patent 4,996,685 is asserted as rendering claims 36,41,54,55,60, 62, 64, 68, 69, 71, 75, 77, 79, 82 anticipated.

Issue 4:     Arrango US Patent 5,732,078 is asserted as rendering claims 36,37,84,90,92,98,118,120-124 anticipated.

Issue 5:     Matsukawa US Patent 5,598,411 is asserted as rendering claims 36, 68, 69, 71, 75, 77, 79, 82 anticipated.

Issue 6:     Yoshida US Patent 5,347,516 is asserted as rendering claims 36,37,54,55,56,58,62, 64, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98 anticipated.

Issue 7:     Focsaneanu in view of Jonas and further in view of Lucent Press Release (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 60-62, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 102, 104 and 118-125 obvious.

Issue 8:     Focsaneanu in view of Farese and further in view of Lucent Press Release (hereinafter Lucent) is asserted as rendering claims 36, 37, 41, 54-58, 60-62, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.

Issue 9:         Focsaneanu in view of Arango and further in view of Lucent Press Release
                 (hereinafter Lucent) is asserted as rendering claims 36, 37, 66-69, 75, 77, 82, 84,
                 90-92, 98, 100, 102 and 118-125 obvious.

Issue 10:        Focsaneanu in view of Matsukawa and further in view of Lucent Press Release
                 (hereinafter Lucent) is asserted as rendering claims 36, 68, 69, 71, 75, 77, 79, 82,
                 84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.

Issue 11:        Focsaneanu in view of Yoshida and further in view of Lucent Press Release
                 (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 64, 68, 69, 75,
                 71, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 118 and 123 obvious.

### *Prosecution History*

Application 11/165,280 which became the '902 patent was filed on June 22, 2005. The

Examiner issued a non-final rejection on September 16, 2005 and an Interview was held on

February 9, 2006 in which the applicant suggested to incorporate the limitation regarding the "3

period for PSTN fallback" into the claims. The applicant amended the claims on March 20, 2006

and filed a Terminal Disclaimer.

The Examiner issued a Notice of Allowance which stated that the prior art does not

disclose "a change over from packet switching, used for trace routing, to line switching when the

digitized speech is sent over an Internet connection, also, a control signal that is produced by a

network management system instead of originating from the user of an end terminal, and a

control device that directs the data packets from the multiple origin end terminals to either the

packet switching device or to the line switching device." A second Notice of Allowance was

mailed on June 14, 2006 that considered an IDS statement. No reasons for allowance were

provided. The Applicant filed an RCE on August 2, 2006 for an apparent consideration of an

Application/Control Number: 95/001,001                                      Page 5
Art Unit: 3992

IDS. The Examiner held an interview on October 3, 2006 discussing two newly cited prior art

references. The Applicant agreed to cancel claims 105-117 in view of the references. The

Examiner also issued a notice of allowance on October 10, 2006 that repeated the initial reasons

for allowance as stated above.

### *The Schindler et al Patent*

A method for transferring data selectively by line switching or by packet switching from
a first switch to a second switch, the first switch being part of or having access to a line-
switching network and a packet switching network, comprising:
a) packetizing the data into data packets in the first switch if the data does not yet exist as
data packets;
b) transferring the data packets from the first switch through the packet-switching
network to the second switch;
c) checking whether a control signal exists for changing-over from the packet-switching
data transfer of the data packets through the packet switching network to a line-switching
connection to the second switch, wherein the control signal is produced by a network
management system;
d) establishing the line-switching connection through the line-switching network to the
second switch in response to said control signal, if the line-switching connection is not yet
present; and
e) changing-over from the packet-switching data transfer of the data packets through the
packet switching network to a line-switching data transfer in response to said control signal and
transferring data over the line switching connection to the second switch.

### *Discussion of the Issues that Raise a SNQ*

### *Focsaneanu*

***Issues 1 and 7-11:***    The Requestor alleges that several substantial new questions of
Patentability (SNQ) are raised by Focsaneanu.

The Focsaneanu patent was cited during prosecution of the Schindler et al. patent, but was

not applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

Application/Control Number: 95/001,001                                    Page 6
Art Unit: 3992

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> "The existence of a substantial new question of patentability is not precluded by the fact that
> a patent or printed publication was previously cited by or to the Office or considered by the
> Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here, Focsaneanu was cited during prosecution of the Schindler patent, thus Focsaneanu

is being presented in a new light, or in a different way, as compared with its use in the earlier

concluded examination.

A discussion of the specifics now follows:

As stated in the request, Focsaneanu '910 teaches the method of transferring data

selectively by line switching or by packet switching (figs. 7 and 8; col. 7, lines 10-15 and col. 9

lines 14-22) from a first switch (Access Module figs. 7, 8 and 13) to a second switch ("Local

Switch" of PSTN Network 212 or 216 -fig. 7; or far "local switch" figs. 4, 5 and 6), the first

switch (Access Module) being part of or having access to a line-switching network (PSTN

Network Figs. 7, 8 and 13) and a packet switching network (Data Network - figs. 7, 8 and 13).

Focsaneanu '910 teaches checking whether a control signal (from Controller 252 to

Processor 246 in response to "identifying circuit" of transceiver 238 -fig. 7) exists for changing-

Application/Control Number: 95/001,001                                    Page 7
Art Unit: 3992

over from the packet-switching data transfer of the data packets through the packet switching

network (Data Network Figs. 7, 8 and 13) to a line-switching connection to the second switch

("Local Switch" of PSTN Network 212 or 216 -fig. 7; "Local Switch" of PSTN Network 360 -

fig. 10; or far "local switch" -figs. 4, 5 and 6), wherein the control signal is produced by a

network management system.

Focsaneanu '910 teaches (the processor enables) changing-over from the packet-

switching data transfer of the data packets through the packet switching network (Data Network -

figs. 7, 8 and 13) to a line-switching (POTS) data transfer in response to said control signal (from

Controller 252 to Processor 246 in response to "identifying circuit" of transceiver 238 -fig. 7)

and transferring data over the line switching connection (PSTN Network -figs. 7, 8 and 13) to the

second switch (Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN

Network 360 Fig. 10; or far "local switch" -figs. 4, 5 and 6).

Focsaneanu disclose that the "identifying circuit" (which is in the access module (which

is part of the "network management system") detects and identifies a service request as a POTS

service or data service request, (col. 8, lines 2-6). When a customer's service request is first

detected, it is determined whether the request is for data services or a POTS service, and then the

type of data service is determined by consulting the database, (col. 8, lines 12-24). Focsaneanu

states that processor 246 performs a selection and enablement of either POTS service or data

service in response to the "identifying circuit" (i.e. in response to a control signal from the

Access Module (network management system).

The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

Application/Control Number: 95/001,001                                         Page 8
Art Unit: 3992

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Focsaneanu raises a SNQ over at least claims 36, 37, 41, 54-58, 60-

62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902

Patent.

　　　　Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Focsaneanu reference raises a SNQ as to at

least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104

and 118-125 of the instant '902 Patent.

### *Jonas*

*Issue 2:*　　　　The Requestor alleges that a substantial new question of Patentability
　　　　　　　　(SNQ) is raised by Jonas.

　　　　The Jonas patent was cited during prosecution of the Schindler et al. patent, but was not

applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined.  On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

　　　　"The existence of a substantial new question of patentability is not precluded by the fact that
　　　　a patent or printed publication was previously cited by or to the Office or considered by the
　　　　Office."

Application/Control Number: 95/001,001                                    Page 9
Art Unit: 3992

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Jonas was not applied by the Examiner during prosecution of the Schindler patent,

thus Jonas is being presented in a new light, or in a different way, as compared with its use in the

earlier concluded examination.

Jonas '792 discloses transferring data selectively by line switching (Bypass Network 30)

or by packet switching (Internet 40) from a first switch (Router 20) to a second switch (Router

21), the first switch being part of or having access to a line-switching network (Bypass Network

30) and a packet switching network (Internet 40).

Jonas '792 discloses checking for a change over signal to change from the packet

switching network (Internet 40) to a line-switching connection (Bypass Network 30) to the

second switch (Router 21) by a network management system. The '792 patent teaches watching

internet traffic to determine if conditions are met to change over from Internet 50 to Bypass

Network 30. "Certain applications, may wish to dynamically take advantage of both the inherent

cost benefit of using the packet-switched Internet and the minimal delay time of circuit-switched

telephone networks. This is accomplished by having the system monitor the transmission delay

between the source router 20 and destination router 21. If this delay rises above a threshold value

the source router 20 will establish a connection over the bypass network 30. The source router 20

may detect the transmission delay to the destination router 21 using a variety of measures known

Application/Control Number: 95/001,001                                    Page 10
Art Unit: 3992

to those skilled in the art, including topological delay time for the transmission...., (col. 5, lines 53-64). The threshold traffic will trigger a signal for the change over.

Jonas '792 discloses "The source computer designates data packets to be transmitted over the bypass circuit- switched telephone network. These data packets are detected by the source router which establishes a connection to the destination router via the bypass circuit-switched telephone network." (abstract, col. 3, lines 44-48; col. 4, line 67-col. 5, line 3' col. 5, lines 58-60).

Jonas '792 discloses causing said first router to dial a telephone number associated with said second router while maintaining the packet-switched connection" (col. 6, lines 47-51; col. 8, lines 19-23).

Jonas '792 discloses "The sending router computer recognizes the request to transmit over the bypass network, establishes a connection over the circuit-switched telephone network, and then transmits the packet over the bypass circuit-switched telephone network.... This is accomplished by having the system monitor the transmission delay between the source router 20 and destination router 21. If this delay rises above a threshold value the source router 20 will establish a connection over the bypass network 30." (col. 3, lines 44-48; col. 5, lines 56-60).

The Jonas '792 patent, therefore teaches the use of a threshold value to trigger a signal to switch over to the bypass network and transmit over this line-switched network.

The teaching of at least checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching connection wherein the control signal is produced by a network management system was not present in the prosecution of the application which became the '902 patent and

Application/Control Number: 95/001,001                              Page 11
Art Unit: 3992

thus it is agreed that Jonas raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64, 66, 68,

69, 71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-124 of the instant '902 Patent.

    Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Jonas reference raises a SNQ as to at least

claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98, 100,102,104

and 118-125 of the instant '902 Patent.


### *Farese*

*Issue 3:*            The Requestor alleges that a substantial new question of Patentability
                     (SNQ) is raised by Farese.

    The Farese patent was cited during prosecution of the Schindler et al. patent, but was not

applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> "The existence of a substantial new question of patentability is not precluded by the fact that
> a patent or printed publication was previously cited by or to the Office or considered by the
> Office."

    For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Farese was not applied by the Examiner during prosecution of the Schindler patent,

thus Farese is being presented in a new light, or in a different way, as compared with its use in

the earlier concluded examination.

Farese '685 teaches "A technique is disclosed for use in conjunction with an ISDN

communications system for permitting a host computer, that is executing a host session with a

user and is connected through the system, to dynamically change an ISDN access path, that

connects the user to the host computer and carries the host session therebetween, between a

packet switched connection and a circuit switched connection during the occurrence of the

session in order to provide the particular connection that is most suited to the communication

requirements of a task currently being executed during the session by the host computer. Any

such dynamic change of the ISDN access path is invoked by the host computer, does not disrupt

the host session and is substantially transparent to the user." Abstract.

Farese '685 teaches "These and other similar deficiencies associated with ISDN

communication systems known in the art are advantageously eliminated in accordance with

the present invention by: dynamically changing the ISDN access path that is established through

an ISDN communication system, e.g. an ISDN switch, between a user terminal and a host

computer from a first connection, such as a B channel circuit switched connection, to a second

connection, such as a D channel packet switched connection or vice versa during an ongoing host

session carried over that access path in order to provide the particular connection, either B

channel circuit switched or D channel packet switched, that is most suited to the current

communication needs of the session. As such, the ISDN connection provided over the access

path, rather than being static as is taught in the art, dynamically changes in response to

commands (suitable control messages) that are issued by the host computer thereby effectively

matching an available communication channel to the current host task being executed during the

session. This dynamic matching of network resources to host requirements advantageously

minimizes wasted transmission bandwidth and conserves network resources." Col. 6:58-7:13.

Farese '685 teaches "System 5 can accommodate a multitude of users to dynamically

change the ISDN channel (between circuit and packet switched) used by each user in accordance

with communication requirements of each corresponding host session thereby dynamically

matching the available communication bandwidth to the host task presently being executed for

that user." Col. 13:3-13:9.  "In any event, receipt of the Q.931 Setup message, if it originates

with the Broker PC, indicates that the Broker PC and there through the ISDN switch have been

instructed by the host computer to change the ISDN connection between the User PC and the

Broker PC from D channel packet switched to B channel circuit switched and that the User PC

should appropriately switch its ISDN connection to the switch. Specifically, once the Q.931 Call

Setup message has been received by the User PC, the User PC will verify whether this message

originated with the Broker PC, i.e. Broker PC 50 shown in FIG. 1, by examining the contents of

a Calling Party Identification field that forms part of this message. If this message did not

originate with the Broker PC, then, as shown by line 223 in FIGS. 2A and 2B, an error condition

has occurred inasmuch as the User PC has received a Q.931 message from a Broker PC that is

not presently associated with the User PC. As such, the User PC will transmit a Q.931 Call

Disconnect message over the D channel to the ISDN switch to instruct the switch to tear down

Application/Control Number: 95/001,001                                    Page 14
Art Unit: 3992

the B Channel circuit switched connection that it has just erroneously established to the User PC.

Once this Disconnect message is transmitted, the state of the User PC transitions back into D

Channel Steady State as indicated by line 223. If, however, the originator of the Q.931 Call

Setup message was the proper Broker PC, i.e. Broker PC 50 shown in FIG. 1, then, as shown in

FIGS. 2A and 2B, the User PC will transition along line 227 to B Channel Establishment state

230 to suitably change its ISDN connection to the switch.

The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Farese raises a SNQ over at least claims 36, 37, 41, 54-58, 60-

62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902

Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Farese reference raises a SNQ as to at least

claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and

118-125 of the instant '902 Patent.

### *Arrango*

*Issue 4:*          The Requestor alleges that a substantial new question of Patentability
                    (SNQ) is raised by Arrango.

The Arrango patent was cited during prosecution of the Schindler et al. patent, but was not

applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined.  On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> "The existence of a substantial new question of patentability is not precluded by the fact that
> a patent or printed publication was previously cited by or to the Office or considered by the
> Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art.  Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Arrango was not applied by the Examiner during prosecution of the Schindler

patent, thus Arrango is being presented in a new light, or in a different way, as compared with its

use in the earlier concluded examination.

Arango '078 teaches that "the present invention is directed to communication networks,

such as the Internet, which include multiple host nodes, or hosts, and multiple router nodes, or

routers, (col. 1, lines 7-9)." Arango describes, among other things, changing over between a

packet switching of data over a WAN such as the Internet and the line-switching of data by

Application/Control Number: 95/001,001                                    Page 16
Art Unit: 3992

means of a special bypass connection established on a "guaranteed bandwidth network," such as

the PSTN or the line switched ISDN, (abstract; fig. 6).

Arango also describes the ability to switch some data from a connection between end

terminals on a packet switched WAN and other data from that connection on the guaranteed

bandwidth network. "...selective routing of some packets from a source node to a destination

node via the wide area network and other packets from the same source node to the same

destination node via the guaranteed bandwidth network", (col. 8, lines 12-21). Thus, Arango

describes a method and structure by which: "[t]he access point, of a host that desires to establish

a time-sensitive communication with a second host, communicates with a second access point of

the second host via the Internet backbone. The two access points then set up a continuous

bandwidth channel via a supplementary guaranteed bandwidth network which bypasses the

Internet backbone, (col. 8, line 59-col. 9, line 3).

Arango discloses network management features of the access point 220 in Figure 8, and

describes how those features signal a change over from packet switching of some data to line

switching. "FIG. 8 shows the relationship of various procedures executed in the OGB server

228,248 (FIG. 6) or 328 (FIG. 7) and the user interface (Web browser) in the hosts 210, 250

(FIG. 6) and routing tables in the access servers 222, 242 (FIG. 6) and guaranteed bandwidth

routers 226, 246 (FIG. 7). As shown, the OGB server executes a route controller agent procedure

420, a route switch agent procedure 410, an access point manager procedure 430 and one or

more interface handler procedures 440, (col. 16, lines 14-22)." "The OGB server 228 then

instructs the guaranteed bandwidth router 226 to set up a communication channel of a specified,

continuous bandwidth (as agreed during the negotiations above) to the guaranteed bandwidth

router 246 using the guaranteed bandwidth address obtained from the OGB server 248. The OGB

server 228 also modifies the routing table of the guaranteed bandwidth router 226 so as to route

packets originating from the host 210 and destined to the host 250 to the router 246 and to

transmit such packets on the channel thus opened. The OGB server 228 also modifies the router

226 routing table so as to route to the access server 222 packets received on the same channel

from the host 246 originating at the host 250 and destined to the host 210." Col. 12:53-65

        Arango teaches "another aspect of the invention pertains to selective routing of some

packets from a  source node to a destination node via the wide area network and other packets

from the same source node to the same destination node via the guaranteed bandwidth network.

This aspect of the invention is applicable to both embodiments described. Furthermore, this

aspect of the invention can apply to a network where the subnetworks, themselves, which contain

the source node and the destination node are connected to the guaranteed bandwidth network,

(col. 7, lines 12-16)". "Thus, the access points contain a connection to the guaranteed bandwidth

network and a connection to the Internet backbone (best effort wide area network). The access

points perform the negotiation for setting up the guaranteed, continuous bandwidth

communication by exchanging packets via the Internet backbone. The access point performs the

IP-to- guaranteed bandwidth network address translation. The access points also establish the

guaranteed continuous bandwidth channel on the guaranteed bandwidth network. Furthermore,

the access points perform the re- routing of selected guaranteed bandwidth packets, so that they

are transmitted via the guaranteed bandwidth channel, and route packets received from the

guaranteed bandwidth channel to the appropriate host connected thereto, (col. 13, lines 55-col.

14, line 2)."

Application/Control Number: 95/001,001                                    Page 18
Art Unit: 3992


The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Arrango raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64, 66,

68, 69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Arrango reference raises a SNQ as to at

least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98,

100,102,104 and 118-125 of the instant '902 Patent.


### *Matsukawa*

***Issue 5:***         The Requestor alleges that a substantial new question of Patentability
                 (SNQ) is raised by Matsukawa.

The Matsukawa patent was cited during prosecution of the Schindler et al. patent, but was

not applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

"The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Matsukawa was not applied by the Examiner during prosecution of the Schindler patent, thus Matsukawa is being presented in a new light, or in a different way, as compared with its use in the earlier concluded examination.

Matsukawa '411 teaches a method for transferring data selectively by line switching or by packet switching (col. 2, lines 45-47) from a first switch (ISDN Terminal Adapter 2) to a second switch (ISDN Protocol Adapter 2'). "Protocol Switching Unit 22 selects between an ISDN line switching network through Speed Matching Unit 23 and an ISDN packet switching network through Packet Processing Unit 24. Thus, the first switch has access to a line switching network and a packet switching network.

Matsukawa teaches that the protocol processing switching unit 22 within the first switch (ISDN Terminal Adapter 2) checks whether a control signal (output of Timer T2) exists. If it exists the system changes over from a packet switching network to a line-switching network (fig. 6). "Thereafter, the timer 27 generates a switching request signal and transmits it to the protocol processing switching unit 22 to select the speed matching unit 24 instead of the packet

Application/Control Number: 95/001,001                                      Page 20
Art Unit: 3992

processing unit 23, (col. 5, lines 39-42; fig. 6)". <u>Timer T2 produces the control signal automatically in the network management system</u> and not by the user.

Matsukawa teaches that in response to the control signal (output of Timer T2), the system switches over from the packet switching data transfer (Packet Protocol Unit 24) to line switching data transfer (Speed Matching Unit 23). ("Thereafter, data communication by circuit switching is established, (col. 6, lines 9-10; fig. 6)".

The teaching of at least checking whether a control signal exists for changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching connection wherein the control signal is produced by a network management system was not present in the prosecution of the application which became the '902 patent and thus it is agreed that Matsukawa raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64, 66, 68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the instant claims under reexamination are patentable. Accordingly, the Matsukawa reference raises a SNQ as to at least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98, 100,102,104 and 118-125 of the instant '902 Patent.

### *Yoshida*

*Issue 6:*          The Requestor alleges that a substantial new question of Patentability
                    (SNQ) are raised by Yoshida.

The Yoshida patent was cited during prosecution of the Schindler et al. patent, but was not

applied during prosecution in a rejection of a claim. Thus a substantial new question of

patentability would be based on patents and/or printed publications already cited/considered in

an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public

Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the

reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> "The existence of a substantial new question of patentability is not precluded by the fact that
> a patent or printed publication was previously cited by or to the Office or considered by the
> Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

Here Yoshida was not applied by the Examiner during prosecution of the Schindler

patent, thus Yoshida is being presented in a new light, or in a different way, as compared with its

use in the earlier concluded examination.

Yoshida '516 discloses an ISDN Access System in fig. 1 for selectively routing a

telephone call from a first end terminal to a second end terminal. Yoshida discloses it is

predetermined that B1 and B2 channels correspond to packet switch and the line switch,

respectively. Therefore, when the channel indicator is representative of the B1 channel in a

single call control, the switch indicator is representative of the packet switch in the call control.

On the other hand, when the channel indicator is representative of the B2 channel in a single call

control, the switch indicator is representative of the line switch in the call control, (col. 5, lines

45-52).

Yoshida also discloses "when the call connection is performed at time $t_2$ the control

channel processor 27 produces the connection acknowledge signal (step S4, FIG. 5). In response

to the connection acknowledge signal, the controller 28 produces the switching signal so that the

switching circuit 20 switches the input port from the first output port 22 to the second output port

23 at time $t_3$ (step S5, FIG. 5). As a result, the packet data signal is delivered as the second

switched signal to the interface circuit 30 and then transmitted in the B2 channel to the line

switch in the ISDN switch 12, (col. 6, lines 22-32; figs. 4 and 5).

The flow chart in Fig. 5 at step 3 (S3) shows "PERFORM CALL CONNECTION FOR

B2 CHANNEL" and thereafter at step 4 (S4) checks to insure the connection was made "CALL

CONNECTION IS PERFORMED?" As indicated in the text above, the B2 channel is the line

switched network connection.


The teaching of at least checking whether a control signal exists for changing-over from

the packet-switching data transfer of the data packets through the packet switching network to a

line-switching connection wherein the control signal is produced by a network management

system was not present in the prosecution of the application which became the '902 patent and

thus it is agreed that Yoshida raises a SNQ over at least claims 36, 37, 41, 54-58, 60-62, 64, 66,

68, 69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant '902 Patent.

Application/Control Number: 95/001,001                                    Page 23
Art Unit: 3992

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Accordingly, the Yoshida reference raises a SNQ as to at

least claims 36, 37, 41, 54-58, 60-62,64,66,68,69,71,75,77,79,82,84,87,90-92, 95, 98,

100,102,104 and 118-125 of the instant '902 Patent.

### *Scope of Reexamination*

4.       Since requester did not request reexamination of claims 1-35,38-40,42-53, 59, 63, 65, 67,

70,72-74,76,78,80-81,83,85,86,88,89,93,94,96,97,99,101 and 103 and did not assert the

existence of a substantial new question of patentability (SNQP) for such claims  (see 35 U.S.C. §

311(b)(2); see also 37 CFR 1.915b and 1.923), such claims will not be reexamined. This matter

was squarely addressed in *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*,

Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. (Not

Reported in F.Supp.2d.) The District Court upheld the Office's discretion to not reexamine

claims in an *inter partes* reexamination proceeding other than those claims for which

reexamination had specifically been requested.  The Court stated:

> To be sure, a party may seek, and the PTO may grant, *inter partes*
> review of each and every claim of a patent. Moreover, while the PTO
> in its discretion may review claims for which *inter partes* review was
> not requested, nothing in the statute compels it to do so.  To ensure
> that the PTO considers a claim for *inter partes* review, § 311(b)(2)
> requires that the party seeking reexamination demonstrate why the
> PTO should reexamine each and every claim for which it seeks review.
> Here, it is undisputed that Sony did not seek review of every claim
> under the '213 and '333 patents.  Accordingly, Sony cannot now claim
> that the PTO wrongly failed to reexamine claims for which Sony never
> requested review, and its argument that AIPA compels a contrary
> result is unpersuasive.

(Slip copy at page 9.)

Application/Control Number: 95/001,001                                    Page 24
Art Unit: 3992

The *Sony* decision's reasoning and statutory interpretation apply analogously to *ex parte* reexamination, as the same relevant statutory language applies to both *inter partes* and *ex parte* reexamination. 35 U.S.C. § 302 provides that the *ex parte* reexamination "request must set forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested" (emphasis added), and 35 U.S.C. § 303 provides that "the Director will determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request..." (Emphasis added). These provisions are analogous to the language of 35 U.S.C. § 311(b)(2) and 35 U.S.C. § 312 applied and construed in *Sony*, and would be construed in the same manner. As the Director can decline to reexamine non-requested claims in an *inter partes* reexamination proceeding, the Director can likewise do so in *ex parte* reexamination proceeding. See *Notice of Clarification of Office Policy To Exercise Discretion in Reexamining Fewer Than All the Patent Claims* (signed Oct. 5, 2006) 1311 OG 197 (Oct. 31, 2006). See also MPEP § 2240, Rev. 5, Aug. 2006.

Therefore, claims 1-35,38-40,42-53, 59, 63, 65, 67, 70,72-74,76,78,80-81, 83, 85, 86, 88, 89, 93,94,96,97,99,101 and 103 will not be reexamined in this *inter partes reexamination* proceeding.

5.    For the reasons set forth *supra*, the request raises an SNQ as to claims 36,37,41,54-58,60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of the instant 7,145,902 Patent to Schindler et al. The request for *inter partes* reexamination is Granted. Claims 36,37,41,54-58,60-62,64,66,68,69,71,75,77,79,82,84,87,90-92,95,98,100,102,104 and 118-125 of U.S. Patent 7,145,902 will be reexamined.

Application/Control Number: 95/001,001                                         Page 25
Art Unit: 3992

### *Conclusion*

### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination
or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and*
> *Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the
same correspondence address as that of the patent is, by way of this revision to 37 CFR
1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as
of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination
proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications
accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the
present proceeding is different from the correspondence address of the patent, it is strongly
encouraged that the patent owner affirmatively file a Notification of Change of Correspondence
Address in the reexamination proceeding and/or the patent (depending on which address patent
owner desires), to conform the address of the proceeding with that of the patent and to clarify the
record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

| | |
|---|---|
| Reexamination and Amendment Practice | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facsimile Transmission No. | (571) 273-9900 |

6.      Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes*

reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant"

and not to the patent owner in a reexamination proceeding. Additionally, 35 U.S.C. 314(c)

requires that inter partes reexamination proceedings "will be conducted with special dispatch"

Application/Control Number: 95/001,001                                    Page 26
Art Unit: 3992

(37 CFR 1.937). Patent owner extensions of time in inter partes reexamination proceedings are

provided for in 37 CFR 1.956. Extensions of time are not available for third party requester

comments, because a comment period of 30 days from service of patent owner's response is set

by statute. 35 U.S.C. 314(b)(3).

7.      The Patent Owner is reminded of the continuing responsibility under 37 CFR 1.985(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the

US Patent 7,145,902 throughout the course of this reexamination proceeding. The Third Party

Requester is also reminded of the ability to similarly apprise the Office of any such activity or

proceeding through the course of this reexamination proceeding. See MPEP § 2686 and

2686.04.

8.      All correspondence relating to this *inter partes* reexamination proceeding should be

directed as follows:

**By U.S. Postal Service Mail** to:

      Mail Stop *Inter Partes* Reexam
      ATTN: Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA 22313-1450

By FAX to:      (571) 273-9900
             Central Reexamination Unit

By hand to:     Customer Service Window
             Randolph Building
             401 Dulany St.
             Alexandria, VA 22314

Application/Control Number: 95/001,001                                           Page 27
Art Unit: 3992

9.    Any inquiry concerning this communication or earlier communications from the

examiner, or as to the status of this proceeding, should be directed to the Central Reexamination

Unit at telephone number (571) 272-7705.

Ovidio Escalante
Primary Examiner
Central Reexamination Unit 3992

Conferee:                                      Conferee:

Application/Control Number: 95/001,001                                    Page 2
Art Unit: 3992

### *Detailed Action*

1.      This Office action address claims  36,37,41,54-58,60-62, 64, 66, 68, 69, 71, 75, 77, 79,

82, 84,87,90-92,95,98,100,102,104 and 118-125 of United States Patent No. 7,145,902

(hereinafter Schindler), for which it has been determined in the Order Granting *Inter Partes*

reexamination, attached hereto, that a substantial new question of patentability was raised in the

request for *inter partes* reexamination, filed on September 7, 2007.

### *Status of the Claims*

2.      Original claims 36,37,41,54-58,60-62, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84,87,90-

92,95,98,100,102,104 and 118-125 are rejected.

### *Rejections Proposed by the Requester*

3.      The following 11 issues of rejections were proposed in the Request:

Issue 1:    Focsaneanu US Patent 5,610,910 is asserted as rendering claims 36,37,54-58, 61,
            64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90-92,95,98,100,102,104,118-120,122-
            125 anticipated.

Issue 2:    Jonas US Patent 6,137,792 is asserted as rendering claims 36,37,54,55,60, 61, 64,
            66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98,100,102,118,120-124
            anticipated.

Issue 3:    Farese US Patent 4,996,685 is asserted as rendering claims 36,41,54,55,60, 62,
            64, 68, 69, 71, 75, 77, 79, 82 anticipated.

Issue 4:    Arango US Patent 5,732,078 is asserted as rendering claims
            36,37,84,90,92,98,118,120-124 anticipated.

Issue 5:    Matsukawa US Patent 5,598,411 is asserted as rendering claims 36, 68, 69, 71,
            75, 77, 79, 82 anticipated.

Application/Control Number: 95/001,001                                    Page 3

Art Unit: 3992

Issue 6:    Yoshida US Patent 5,347,516 is asserted as rendering claims
            36,37,54,55,56,58,62, 64, 68, 69, 71, 75, 77, 79, 82, 84, 87,90,92,95,98
            anticipated.


Issue 7:    Focsaneanu in view of Jonas and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 60-62, 64, 66,
            68, 69, 71, 75, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 102, 104 and 118-125
            obvious.

Issue 8:    Focsaneanu in view of Farese and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 41, 54-58, 60-62, 64,
            66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.


Issue 9:    Focsaneanu in view of Arango and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 66-69, 75, 77, 82, 84,
            90-92, 98, 100, 102 and 118-125 obvious.


Issue 10:   Focsaneanu in view of Matsukawa and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 68, 69, 71, 75, 77, 79, 82,
            84, 87, 90, 92, 95, 98, 100, 118 and 123 obvious.


Issue 11:   Focsaneanu in view of Yoshida and further in view of Lucent Press Release
            (hereinafter Lucent) is asserted as rendering claims 36, 37, 54-58, 64, 68, 69, 75,
            71, 77, 79, 82, 84, 87, 90-92, 95, 98, 100, 118 and 123 obvious.

        The proposed rejections identified in issues 1-6 are adopted.

        The proposed rejections identified in issues 7-11 are not adopted.


### *Claim Rejections - 35 USC § 102*

4.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

    A person shall be entitled to a patent unless –

    (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on
    sale in this country, more than one year prior to the date of application for patent in the United States.

Application/Control Number: 95/001,001                                    Page 4

Art Unit: 3992

> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed
> in the United States before the invention by the applicant for patent or (2) a patent granted on an application for
> patent by another filed in the United States before the invention by the applicant for patent, except that an
> international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this
> subsection of an application filed in the United States only if the international application designated the United
> States and was published under Article 21(2) of such treaty in the English language.

## *Issue 1*

### *Requester Proposed Rejection (Adopted)*

5.       Claims 36, 37,54-58, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87,90-92, 95, 98, 100, 102,

104, 118-120,122-125 are rejected under 35 U.S.C. 102(e) as being anticipated by Focsaneanu

US Patent 5,610,910.

### *Regarding claim 36:*

**A method for transferring data selectively by line switching or by packet switching**

**from a first switch to a second switch, the first switch being part of or having access to a**

**line-switching network and a packet switching network, comprising:**

Focsaneanu discloses the method of transferring data selectively by line switching or by

packet switching (figs. 7 and 8; col. 7, lines 10-15; col. 9, lines 14-22) from a first switch

(Access Module - figs. 7, 8 and 13) to a second switch ("Local Switch" of PSTN Network 212 or

216 - fig. 7; or far "local switch" Figs. 4, 5 and 6), the first switch (Access Module) being part of

or having access to a line-switching network (PSTN Network Figs. 7, 8 and 13) and a packet

switching network (Data Network -figs. 7, 8 and 13), (col. 7, line 67-col. 8, line 14).

**a) packetizing the data into data packets in the first switch if the data does not yet**

**exist as data packets;**

Application/Control Number: 95/001,001                                      Page 5
Art Unit: 3992

Focsaneanu discloses the step of packetizing data into data packets in PAD 254 (Packet

Assembly/Disassembly 254 Fig. 8; 550 Fig. 13) of the Access Module (first switch) if the data

does not yet exist as data packets, (figs. 8 and 13), (col. 8, lines 20-26; col. 11, lines 12-15).

**b) transferring the data packets from the first switch through the packet-switching**
**network to the second switch;**

Focsaneanu discloses the step of transferring data packets from the first switch (Access

Module Figs. 7, 8 and 13) through the packet-switching network (Data Network Figs. 7, 8 and

13) to the second switch ("Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of

PSTN Network 360 Fig. 10; or far "local switch" Figs. 4, 5 and 6). The Access Module causes

the data packets to be transferred to the second switch through the packet-switching network

(Data Network), (col. 9, lines 14-22,30-46,60-66).

**c) checking whether a control signal exists for changing-over from the packet-**
**switching data transfer of the data packets through the packet switching network to a line-**
**switching connection to the second switch, wherein the control signal is produced by a**
**network management system;**

Focsaneanu discloses checking whether a control signal (from Controller 252 to

Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7) exists for changing-

over from the packet-switching data transfer of the data packets through the packet switching

network (Data Network Figs. 7, 8 and 13) to a line-switching connection to the second switch

("Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN Network 360 Fig.

10; or far "local switch" Figs. 4, 5 and 6), wherein the control signal is produced by a network

management system, (col. 7, line 67-col. 8, line 14; col. 9, lines 31-33; col. 10, lines 7-9,20-22, 42-45; col. 11, lines 60-67).

    **d) establishing the line-switching connection through the line-switching network to the second switch in response to said control signal, if the line-switching connection is not yet present; and**

    Focsaneanu discloses establishing a line-switching connection through the line-switching network (PSTN Network Figs. 7, 8 and 13) to the second switch ("Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN Network 360 Fig. 10; or far "local switch" Figs. 4, 5 and 6) in response to said control signal (from Controller 252 to Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7), if the line-switching connection is not yet present, (col. 10, lines 7-16; col. 7, line 67-col. 8, line 14; col. 11, lines 7-15).

    **e) changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching data transfer in response to said control signal and transferring data over the line switching connection to the second switch.**

    Focsaneanu discloses (the processor enables) changing-over from the packet-switching data transfer of the data packets through the packet switching network (Data Network Figs. 7, 8 and 13)to a line-switching (POTS) data transfer in response to said control signal (from Controller 252 to Processor 246 in response to "identifying circuit" of transceiver 238 Fig. 7) and transferring data over the line switching connection PSTN Network Figs. 7, 8 and 13) to the second switch (Local Switch" of PSTN Network 212 or 216 Fig. 7; "Local Switch" of PSTN Network 360 Fig. 10; or far "local switch" Figs. 4, 5 and 6), (col. 8, lines 12-15; col. 10, lines 20-24; col. 11, lines 7-15; col. 14, lines 13-20).

Application/Control Number: 95/001,001                                    Page 7
Art Unit: 3992

### *Regarding claims 37,54-58,61,64 and 66:*

The rejection was proposed by the third party requester in the request for reexamination,

and it is adopted for the reasons set forth in the request for reexamination at pages 166-167 (

claims 37/36 under Focsaneanu '910), page 169-170 (claims 54/36 under Focsaneanu '910),

page 172-173 (claims 55/54/36 under Focsaneanu '910), page 174 (claims 56/54/36 under

Focsaneanu '910), page 175-176 (claims 57/56/54/36 under Focsaneanu '910), page 176 (claims

58/56/54/36 under Focsaneanu '910), page 178-179 (claims 61/54/36 under Focsaneanu '910),

page 180-181 (claims 64/54/36 under Focsaneanu '910), page 183-184 (claims 66/36 under

Focsaneanu '910), which are hereby incorporated by reference.

### *Regarding claim 68:*

**Switching apparatus for selectively routing a telephone call from a first end**
**terminal to a second end terminal, comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for selectively routing a

telephone call from a first end terminal (CPE or data terminal, POTS phone, ISDN terminal or

fax) to a second end terminal (CPE), (figs. 4, 7; col. 7, line 67-col. 8, line 14).

**a device that provides access to a packet switching network through which data can**
**be sent for delivery to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a packet switching (Data)

network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu

discloses the Access Module has access to a line-switching network and a packet switching

network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,

in which a plurality of different types of CPEs can access a plurality of different types of services

Application/Control Number: 95/001,001                                    Page 8
Art Unit: 3992

provided by service providers which may utilize different types of transport networks, e.g. PSTN

212 and data switched networks 214. The access module 208 connects service providers who

may have their own networks or may utilize any of a plurality of transport networks 212, 214 and

216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

**means for transferring first data of the telephone call originated by the first**

**terminal through the packet switching network for delivery to the second end terminal;**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs.

7, 8 and 13) for transferring data from the first terminal (CPE shown in Figs. 7, 8 and 13)

through the packet-switching network (Data Network Figs. 7, 8 and 13) to the second end

terminal (DTE at the far side of the Data Network Figs. 7, 8 and 13), (figs. 5 and 6, col. 6, line 3-

44).

**a device for establishing a connection to a line-switching network through which**

**data can be sent for delivery to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a line-switching (PSTN)

network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu

discloses the Access Module has access to a line-switching network and a packet switching

network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,

in which a plurality of different types of CPEs can access a plurality of different types of services

provided by service providers which may utilize different types of transport networks, e.g. PSTN

212 and data switched networks 214. The access module 208 connects service

providers who may have their own networks or may utilize any of a plurality of transport

networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

**means for transferring second data of the telephone call originated by the first terminal over the connection through the line-switching network for delivery to the second end terminal;**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs. 7, 8 and 13) for transferring second data of a telephone call from the first terminal (CPE shown in Figs. 7, 8 and 13) over the connection through the line-switching network (PSTN Figs. 7, 8 and 13) for delivery to the second end terminal (DTE at the far side of the PSTN network Figs. 7, 8 and 13), (figs. 4, 5 and 6; col. 5, line 47-col. 6, line 44).

**and means responsive to a control signal for changing-over from a packet-switching mode of transfer of the first data of the telephone call to a line-switching mode of transfer of the second data of the telephone call without interruption of a call-up procedure, wherein said control signal is produced by a network management system.**

Focsaneanu discloses the function and corresponding structure (the processor) for changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8 and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS service [Line Switching] or data services [Packet Switching] in response to the identifying circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

### Regarding claim 69:

**Switching apparatus for selectively routing a telephone call from a first end**

**terminal to a second end terminal, comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for selectively routing a

telephone call from a first end terminal (CPE or data terminal, POTS phone, ISDN terminal or

fax) to a second end terminal (CPE), (figs. 4, 7; col. 7, line 67-col. 8, line 14).

**means for establishing a connection to a packet switching network through which**

**data can be sent to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a packet switching (Data)

network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu

discloses the Access Module has access to a line-switching network and a packet switching

network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,

in which a plurality of different types of CPEs can access a plurality of different types of services

provided by service providers which may utilize different types of transport networks, e.g. PSTN

212 and data switched networks 214. The access module 208 connects service providers who

may have their own networks or may utilize any of a plurality of transport networks 212, 214 and

216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

Application/Control Number: 95/001,001                                    Page 11
Art Unit: 3992

**means for transferring first data of the telephone call originated by the first end terminal over the connection through the packet switching network for delivery to the second end terminal,**

Focsaneanu discloses the function and corresponding structure (Access Module in Figs. 7, 8 and 13) for transferring data from the first terminal (CPE shown in Figs. 7, 8 and 13) through the packet-switching network (Data Network Figs. 7, 8 and 13) to the second end terminal (DTE at the far side of the Data Network Figs. 7, 8 and 13), (figs. 5 and 6, col. 6, line 3-44).

**means for establishing a connection to a line-switching network through which data can be sent for delivery to the second end terminal;**

Focsaneanu discloses an Access Module that provides access to a line-switching (PSTN) network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu discloses the Access Module has access to a line-switching network and a packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment, in which a plurality of different types of CPEs can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208 connects service providers who may have their own networks or may utilize any of a plurality of transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

**means for transferring second data of the telephone call originated by first end terminal over the connection through the line-switching network for delivery to the second end terminal; and**

Application/Control Number: 95/001,001                                          Page 12
Art Unit: 3992

Focsaneanu discloses the function and corresponding structure (Access Module in Figs.
7, 8 and 13) for transferring second data of a telephone call from the first terminal (CPE shown
in Figs. 7, 8 and 13) over the connection through the line-switching network (PSTN Figs. 7, 8
and 13) for delivery to the second end terminal (DTE at the far side of the PSTN network Figs.
7, 8 and 13), (figs. 4, 5 and 6; col. 5, line 47-col. 6, line 44).

**means responsive to a control signal for changing-over from a packet-switching
mode of transfer of the first data of the telephone call to a line-switching mode of transfer
of the second data of the telephone call without interruption of a call set-up procedure.**

Focsaneanu discloses the function and corresponding structure (the processor) for
changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of
the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8
and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either
POTS service [Line Switching] or data services [Packet Switching] in response to the identifying
circuit, (col. 8, lines 12-15).  Focsaneanu discloses dynamically selecting a network to transfer a
call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic
change over is first described: "... change of mode can be... a result of an automated non-
intrusive observation of the channel..." where the access module monitors communications
activity, (col. 10, lines 20-24).

***Regarding claims 71 and 75:***

The rejection was proposed by the third party requester in the request for reexamination,
and it is adopted for the reasons set forth in the request for reexamination at pages 258-260 (

claim 71 under Focsaneanu '910) and page 266 (claim 75 under Focsaneanu '910) which are

hereby incorporated by reference.

***Regarding claim 77:***

    **A method of selectively routing a telephone call from a first end terminal to a second
end terminal, comprising:**

    Focsaneanu discloses an (Access Module) for selectively routing a telephone call from a

first end terminal (CPE or data terminal, POTS phone, ISDN terminal or fax) to a second end

terminal (CPE), (figs. 4, 7; col. 7, line 67-col. 8, line 14).

    **establishing access of said first end terminal to a packet switching network through
which data can be sent for delivery to the second end terminal;**

    Focsaneanu discloses an Access Module that provides access to a packet switching (Data)

network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu

discloses the Access Module has access to a line-switching network and a packet switching

network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment,

in which a plurality of different types of CPEs can access a plurality of different types of services

provided by service providers which may utilize different types of transport networks, e.g. PSTN

212 and data switched networks 214. The access module 208 connects service providers who

may have their own networks or may utilize any of a plurality of transport networks 212, 214 and

216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

    **transferring first data of the telephone call originated by the first end terminal over
the packet switching network for delivery to the second end terminal,**

Application/Control Number: 95/001,001                                    Page 14
Art Unit: 3992

Focsaneanu discloses the function and corresponding structure (Access Module in Figs. 7, 8 and 13) for transferring data from the first terminal (CPE shown in Figs. 7, 8 and 13) through the packet-switching network (Data Network Figs. 7, 8 and 13) to the second end terminal (DTE at the far side of the Data Network Figs. 7, 8 and 13), (figs. 5 and 6, col. 6, line 3-44).

**responding to a control signal for changing-over from a packet-switching mode of transfer of the first data of the telephone call to a line-switching mode of transfer of second data of the telephone call originated by the first end terminal without interruption of a call set-up procedure,**

Focsaneanu discloses the function and corresponding structure (the processor) for changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8 and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS service [Line Switching] or data services [Packet Switching] in response to the identifying circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic change over is first described: "... change of mode can be... a result of an automated non-intrusive observation of the channel..." where the access module monitors communications activity, (col. 10, lines 20-24).

**by establishing a connection from said first end terminal to a line-switching network through which data can be sent for delivery to the second end terminal and**

Application/Control Number: 95/001,001                                    Page 15
Art Unit: 3992

Focsaneanu discloses the function and corresponding structure (Access Module in Figs. 7, 8 and 13) for transferring second data of a telephone call from the first terminal (CPE shown in Figs. 7, 8 and 13) over the connection through the line-switching network (PSTN Figs. 7, 8 and 13) for delivery to the second end terminal (DTE at the far side of the PSTN network Figs. 7, 8 and 13), (figs. 4, 5 and 6; col. 5, line 47-col. 6, line 44).

**establishing said line-switching mode of transfer of the second data of the telephone call over the connection through the line-switching network for delivery to the second end terminal.**

Focsaneanu discloses an Access Module that provides access to a line-switching (PSTN) network through which data can be sent for delivery to a second end terminal (CPE). Focsaneanu discloses the Access Module has access to a line-switching network and a packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment, in which a plurality of different types of CPEs can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208 connects service providers who may have their own networks or may utilize any of a plurality of transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

***Regarding claims 79 and 82:***

The rejection was proposed by the third party requester in the request for reexamination, and it is adopted for the reasons set forth in the request for reexamination at page 291 (claim 79 under Focsaneanu '910) and page 294-295 (claim 82 under Focsaneanu '910) which are hereby incorporated by reference.

*Regarding claim 84:*

**Switching apparatus for switching data packets from multiple origin end terminals,**
**the data packets containing headers including information identifying respective origin and**
**destination end terminals, the switching apparatus comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for switching data packets
from multiple origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax),
(figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP
protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known
in the art that information sent over the Internet must follow the TCP/IP protocol which requires
headers, and the information regarding the origin address and destination address is contained in
the TCP/IP headers.

**a packet switching device for transferring data packets through a packet switching**
**network through which data can be sent for delivery to destination end terminals;**

Focsaneanu discloses an Access Module for transferring data packets through a packet
switching (Data) network through which data can be sent for delivery to destination end terminal
s (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a
packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the
actual environment, in which a plurality of different types of CPEs can access a plurality of
different types of services provided by service providers which may utilize different types of
transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

Application/Control Number: 95/001,001                                         Page 17
Art Unit: 3992

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39;

figs. 4-6).

**a line switching device for establishing line connections through a line-switching**

**network through which data can be sent to the destination end terminals; and**

Focsaneanu discloses an Access Module that establishes line connections through a line-

switching (PSTN) network through which data can be sent to the destination end terminals

(CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a

packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the

actual environment, in which a plurality of different types of CPEs can access a plurality of

different types of services provided by service providers which may utilize different types of

transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

**a control device connected to the packet switching device and the line switching**

**device for directing the data packets from the multiple origin end terminals to either the**

**packet switching device or to the line switching device,**

Focsaneanu  discloses a control device such as processor 246 and/or controller 252, which are

connected to the packet switching device and the line switching device for directing the data

packets from the multiple origin end terminals to either the packet switching device or to the line

switching device.

Application/Control Number: 95/001,001                                    Page 18
Art Unit: 3992

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either

POTS service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

**the control device being responsive to the data packet headers for controlling the**

**packet switching device and the line switching device for establishing and maintaining**

**respective communications connections for data transfer with real-time properties between**

**origin end terminals and destination end terminals,**

Focsaneanu discloses a control device such as processor 246 and/or controller 252, which

is responsive to the data packet headers for controlling the packet switching device and the line

switching device for establishing and maintaining respective communications connections for

data transfer with real-time properties between origin end terminals and destination end

terminals, (col. 7, lines 10-15,36-39).

**the control device also being responsive to a control signal for changing-over from**

**packet-switching transfer of first data of a communications connection to line-switching**

Application/Control Number: 95/001,001                                                    Page 19
Art Unit: 3992

**transfer of second data of the communication connection without interruption of the
communications connection.**

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS

service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

*Regarding claims 87,90 and 91:*

The rejection was proposed by the third party requester in the request for reexamination,

and it is adopted for the reasons set forth in the request for reexamination at pages 317-318

(claim 87 under Focsaneanu '910), page 320 (claim 90 under Focsaneanu '910) and pages 322-

323 (claim 91 under Focsaneanu '910) which are hereby incorporated by reference.

*Regarding claim 92:*

**A method of routing data packets from multiple origin end terminal in a data network, the data packets containing headers including information identifying respective origin and destination end terminals in the data network, the method comprising:**

Focsaneanu discloses a (Access Module) for switching data packets from multiple origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax), (figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known in the art that information sent over the Internet must follow the TCP/IP protocol which requires headers, and the information regarding the origin address and destination address is contained in the TCP/IP headers.

**directing the data packets from the multiple end terminals to either a packet switching device or to a line switching device by inspecting the data packet headers, and in response to the data packet headers, establishing and maintaining respective communications connections for data transfer with real-time properties between origin end terminals and destination end terminals,**

Focsaneanu discloses a control device such as processor 246 and/or controller 252, which are connected to the packet switching device and the line switching device for directing the data packets from the multiple origin end terminals to either the packet switching device or to the line switching device.

Focsaneanu discloses the function and corresponding structure (the processor) for changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

Application/Control Number: 95/001,001                                    Page 21
Art Unit: 3992

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either

POTS service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

Focsaneanu discloses processor 246 and/or controller 252, which is responsive to the data

packet headers for controlling the packet switching device and the line switching device for

establishing and maintaining respective communications connections for data transfer with real-

time properties between origin end terminals and destination end terminals, (col. 7, lines 10-

15,36-39).

**and responding to a control signal by changing-over from packet-switching transfer**

**of first data of at least one of the communications connections over a packet-switching**

**network to line-switching transfer of second data of said at least one of the communication**

**connections over a line-switching network without interruption of said at least one of the**

**communications connections.**

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

Application/Control Number: 95/001,001            Page 22
Art Unit: 3992

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS

service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

### *Regarding claims 95 and 98:*

The rejection was proposed by the third party requester in the request for reexamination,

and it is adopted for the reasons set forth in the request for reexamination at pages 338-339

(claim 95 under Focsaneanu '910) and  page 341 (claim 98 under Focsaneanu '910) which are

hereby incorporated by reference.


### *Regarding claim 100:*

**Switching apparatus for switching Internet Protocol (IP) data packets from multiple**

**origin end terminals, the data packets containing headers including information identifying**

**respective origin and destination end terminals, the switching apparatus comprising:**

Focsaneanu discloses a switching apparatus (Access Module) for switching data packets

from multiple origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax),

(figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known in the art that information sent over the Internet must follow the TCP/IP protocol which requires headers, and the information regarding the origin address and destination address is contained in the TCP/IP headers.

**an IP packet switching device for packet-switching transfer of data through the Internet for delivery to destination end terminals;**

Focsaneanu discloses an Access Module for transferring data packets through a packet switching (Data) network through which data can be sent for delivery to destination end terminals (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the actual environment, in which a plurality of different types of CPEs can access a plurality of different types of services provided by service providers which may utilize different types of transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208 connects service providers who may have their own networks or may utilize any of a plurality of transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39; figs. 4-6).

**a line switching device for establishing line connections through a public telephone network through which data can be sent to the destination end terminals; and**

Focsaneanu discloses an Access Module that establishes line connections through a line-switching (PSTN) network through which data can be sent to the destination end terminals (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a

packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the

actual environment, in which a plurality of different types of CPEs can access a plurality of

different types of services provided by service providers which may utilize different types of

transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39).

**a control device connected to the IP packet switching device and the line switching**

**device for directing the IP data packets from the multiple origin end terminals to either the**

**packet switching device or to the line switching device,**

Focsaneanu  discloses a control device such as processor 246 and/or controller 252, which are

connected to the packet switching device and the line switching device for directing the data

packets from the multiple origin end terminals to either the packet switching device or to the line

switching device.

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Focsaneanu discloses a processor 246 performs a selection and enablement of either

POTS service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15).  Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

**the control device being responsive to the data packet headers for controlling the**

**packet switching device and the line switching device for establishing and maintaining**

**respective communication connections for data transfer with real-time properties between**

**origin end terminals and destination end terminals,**

Focsaneanu discloses a control device such as processor 246 and/or controller 252, which

is responsive to the data packet headers for controlling the packet switching device and the line

switching device for establishing and maintaining respective communications connections for

data transfer with real-time properties between origin end terminals and destination end

terminals, (col. 7, lines 10-15,36-39).

**and the control device also being responsive to an overload in the Internet for**

**automatically changing-over from packet-switching transfer of first data of a**

**communications connection to line-switching transfer of second data of the communication**

**connection without interruption of the communications connection when a data blockage**

**occurs in the routing of data packets of the first data of the communications connection**

**through the Internet.**

Focsaneanu discloses the function and corresponding structure (the processor) for

changing-over from the packet-switching mode of transfer (Data Network Figs. 7, 8 and 13) of

the first data of the telephone call to a line-switching mode of transfer (PSTN Network Figs. 7, 8

and 13) of the second data of the telephone call without interruption of a call-up procedure.

Application/Control Number: 95/001,001                                    Page 26
Art Unit: 3992

Focsaneanu discloses a processor 246 performs a selection and enablement of either POTS

service [Line Switching] or data services [Packet Switching] in response to the identifying

circuit, (col. 8, lines 12-15). Focsaneanu discloses dynamically selecting a network to transfer a

call from a Data network (packet-switching) to a PSTN network (Line-switching). A basic

change over is first described: "... change of mode can be... a result of an automated non-

intrusive observation of the channel..." where the access module monitors communications

activity, (col. 10, lines 20-24).

### *Regarding claims 102 and 104:*

The rejection was proposed by the third party requester in the request for reexamination,

and it is adopted for the reasons set forth in the request for reexamination at pages 354-355

(claim 102 under Focsaneanu '910) and page 356-357 (claim 104 under Focsaneanu '910)

which are hereby incorporated by reference.

### *Regarding claim 118:*

**A method of routing IP data packets from multiple origin end terminals in an IP**

**data network, the IP data packets containing headers including information identifying**

**respective origin and destination end terminals in the IP data network, the method**

**comprising:**

Focsaneanu discloses an (Access Module) for switching data packets from multiple

origin end terminals (CPE or data terminal, POTS phone, ISDN terminal or fax), (figs. 7 and 15).

Focsaneanu discloses data networks and database services are accessed using a TCP/IP

protocol, (col. 3, lines 6-7, 45-56; col. 7, lines 15-18). The Examiner notes that it is well known

Application/Control Number: 95/001,001                                    Page 27
Art Unit: 3992

in the art that information sent over the Internet must follow the TCP/IP protocol which requires

headers, and the information regarding the origin address and destination address is contained in

the TCP/IP headers.

**inspecting the IP data packet headers at a switch in the IP data network in order to**

**establish a respective communications connection for IP data packets from at least one of**

**the origin terminals to a destination end terminal in the IP network, the respective**

**communications connection being initiated from the switch by packet switching of IP data**

**packets from the switch, and**

Focsaneanu discloses an Access Module for transferring data packets through a packet

switching (Data) network through which data can be sent for delivery to destination end terminal

s (CPEs). Focsaneanu discloses the Access Module has access to a line-switching network and a

packet switching network: "FIG. 7 illustrates diagrammatically the invention embodied in the

actual environment, in which a plurality of different types of CPEs can access a plurality of

different types of services provided by service providers which may utilize different types of

transport networks, e.g. PSTN 212 and data switched networks 214. The access module 208

connects service providers who may have their own networks or may utilize any of a plurality of

transport networks 212, 214 and 216 for services requested by CPEs, (col. 7, lines 10-15,36-39;

figs. 4-6).

**ensuring that the respective communications connection has a desired bandwidth by**

**changing over, from the packet switching of the IP data packets from the switch, to line**

**switching of the IP data packets from said at least one of the origin end terminals to said**

**destination end terminal, when it is found that the packet switching of the IP data packets**

**from the switch does not have the desired bandwidth.**

Focsaneanu discloses dynamic conversion of voice call data for the purpose of

completing a call on one network that was started on a different network, dynamic mid call

switching. "The access module also has the capability of providing conversion between

packetized voice and PCM to allow for alternate routing. This allows the use of a multiplicity of

access and transport networks in the establishment, translation, and completion of a service

transaction by the access module under the control of the end user, (col. 13, lines 22-34)

Focsaneanu provides for dynamic traffic load balancing, alternate routing, resource

sharing and service management of the information transfer throughout the network, thereby

minimizing protocol and transport translations between the end points, (col. 14, lines 13-20).

*Regarding claims 119,120,122-125:*

The rejection was proposed by the third party requester in the request for reexamination,

and it <u>is adopted</u> for the reasons set forth in the request for reexamination at pages 354-355

(claim 102 under Focsaneanu '910) and page 356-357 (claim 104 under Focsaneanu '910)

which are hereby incorporated by reference.

### Issue 2

### *Requester Proposed Rejection (Adopted)*

6.        Claims 36,37,54,55,60, 61, 64, 66, 68, 69, 71, 75, 77, 79, 82, 84, 87, 90, 92, 95, 98, 100,

102, 118,120-124 are rejected under 35 U.S.C. 102(e) as being anticipated by Jonas US Patent

6,137,792.

*Regarding claim 36:*

**A method for transferring data selectively by line switching or by packet switching from a first switch to a second switch, the first switch being part of or having access to a line-switching network and a packet switching network, comprising:**

Jonas discloses transferring data selectively by line switching (Bypass Network 30) or by packet switching (Internet 40) from a first switch (Router 20) to a second switch (Router 21), the first switch being part of or having access to a line-switching network (Bypass Network 30) and a packet switching network (Internet 40), (fig. 1; col. 3, lines 35-48)

**a) packetizing the data into data packets in the first switch if the data does not yet exist as data packets;**

Jonas discloses packetizing data into data packets in the first switch if the data does not yet exist as data packets. Jonas teaches that all communications across public packet-switched networks, such as the Internet, are broken up into...packets. Each computer (or "host") connected to the packet-switched network is assigned a unique IP address. Hosts are connected to the public packet-switched networks through routers which interconnect physical networks and perform routing and relaying functions. Every data packet transmitted between two hosts via TCP/IP contains a "header" that includes, among other fields, (i) the internet address of the source host (the host generating and sending the packet) and (ii) the internet address of the destination host (the host intended to receive the packet., (col. 1, lines 30-42). Since every message sent across the Internet by Router 20 (first switch) must be packetized, it is inherent that the data must be packetized before it arrives at Router 20 (first switch), or Router 20 must packetize it.

**b) transferring the data packets from the first switch through the packet-switching network to the second switch;**

Application/Control Number: 95/001,001                                    Page 30
Art Unit: 3992

Jonas discloses transferring the data packets from the first switch (Router 20) through the

packet-switching network (Internet 40) to the second switch (Router 21). Normally, hosts 1 and 2

would transmit data to each other through routers 20 [first switch] and 21 [first switch] over the

Internet 40 [packet-switching network], (col. 4, lines 13-14).

**c) checking whether a control signal exists for changing-over from the packet-**

**switching data transfer of the data packets through the packet switching network to a line-**

**switching connection to the second switch, wherein the control signal is produced by a**

**network management system;**

Jonas discloses checking for a change over signal to change from the packet switching

network (Internet 40) to a line-switching connection (Bypass Network 30) to the second switch

(Router 21) by a network management system. Jonas teaches watching Internet traffic to

determine if conditions are met to change over from Internet 50 to Bypass Network 30. "Certain

applications, may wish to dynamically take advantage of both the inherent cost benefit of using

the packet-switched Internet and the minimal delay time of circuit-switched telephone network

established having the system monitor the transmission delay between the source router 20 and

destination router 21. If this delay rises above a threshold value the source router 20 will

establish a connection over the bypass network 30. The source router 20 may detect the

transmission delay to the destination router 21 using a variety of measures known to those skilled

in the art, including topological delay time for the transmission...., (col. 5, lines 53-64). The

threshold traffic will trigger a signal for the change over, which is well known in the art.

Application/Control Number: 95/001,001                                    Page 31
Art Unit: 3992

**d) establishing the line-switching connection through the line-switching network to the second switch in response to said control signal, if the line-switching connection is not yet present; and**

Jonas discloses the source computer designates data packets to be transmitted over the bypass circuit-switched telephone network. These data packets are detected by the source router which establishes a connection to the destination router via the bypass circuit-switched telephone network, (abstract; col. 3, lines 44-48; col. 4, line 67-col. 5, line 3, 58-60).

**e) changing-over from the packet-switching data transfer of the data packets through the packet switching network to a line-switching data transfer in response to said control signal and transferring data over the line switching connection to the second switch.**

Jonas discloses the sending router computer recognizes the request to transmit over the bypass network, establishes a connection over the circuit-switched telephone network, and then transmits the packet over the bypass circuit-switched telephone network.... This is accomplished by having the system monitor the transmission delay between the source router 20 and destination router 21. If this delay rises above a threshold value the source router 20 will establish a connection over the bypass network 30, (col. 3, line 44-48; col. 5, line 56-60). Jonas, therefore teaches the use of a threshold value to trigger a signal to switch over to the bypass network and transmit over this line-switched network.

***Regarding claims 37,54,55,60,61,64 and 66:***

The rejection was proposed by the third party requester in the request for reexamination, and it is adopted for the reasons set forth in the request for reexamination at page 167 (claims 37/36 under Jonas '792), page 170 (claims 54/36 under Jonas '792), page 173 (claims 55/54/36

under Jonas '792), page 177 (claims 60/54/36 under Jonas '792), page 179 (claims 61/54/36

under Jonas '792), page 181 (claims 64/54/36 under Jonas '792), page 184 (claims 66/36 under

Jonas '792), which are hereby incorporated by reference.


***Regarding claim 68:***

    **Switching apparatus for selectively routing a telephone call from a first end
terminal to a second end terminal, comprising:**

    Jonas discloses a switching apparatus for transferring data selectively by line switching

(Bypass Network 30) or by packet switching (Internet 40) from a first switch (Router 20) to a

second switch (Router 21), the first switch being part of or having access to a line-switching

network (Bypass Network 30) and a packet switching network (Internet 40), (fig. 1; col. 3, lines

35-48)

    **a device that provides access to a packet switching network through which data can
be sent for delivery to the second end terminal;**

    Jonas discloses transferring the data packets from a device (Router 20) through the

packet-switching network (Internet 40) to Router 21. Normally, hosts 1 and 2 would transmit

data to each other through routers 20 and 21 over the Internet 40 [packet-switching network],

(col. 4, lines 13-14).

    **means for transferring first data of the telephone call originated by the first
terminal through the packet switching network for delivery to the second end terminal;**

    Jonas discloses Router 20 for transferring first data (a packet or packets in a stream of

packets) of the telephone call originated by the first terminal (host 1) through the packet

Application/Control Number: 95/001,001                                    Page 33
Art Unit: 3992

switching network (Internet 40) for delivery to the second end terminal (Host 2). Normally, hosts

1 and 2 would transmit data to each other through routers 20 and 21 over the Internet 40, (col. 4,

lines 13-14).

**a device for establishing a connection to a line-switching network through which**

**data can be sent for delivery to the second end terminal;**

Jonas discloses a device (Router 20) for establishing a connection to a line-switching

network (Bypass network 30) through which data can be sent for delivery to the second end

terminal (Host 2). "The source router 20 then establishes a connection (i.e. "dials" the call) over

the circuit-switched [line-switched] network 30 to the destination router 21..., (col. 4, line 67-col.

5, line 3).

**means for transferring second data of the telephone call originated by the first**

**terminal over the connection through the line-switching network for delivery to the second**

**end terminal;**

Jonas discloses (Router 20) for transferring second data (a portion of packets in a stream

of packets) of the telephone call originated by the first terminal (Host 1) over the connection

through the line-switching network (Bypass Network 30) for delivery to the second end terminal

(Host 2). The destination router 21 will receive notification of an incoming call over the circuit-

switched network and execute a process to accept the connection and integrate data packets from

this connection into the packets received from the packet-switched connection, (col. 4, line 67-

col. 5, line 3).

**and means responsive to a control signal for changing-over from a packet-switching**

**mode of transfer of the first data of the telephone call to a line-switching mode of transfer**

**of the second data of the telephone call without interruption of a call-up procedure,**

**wherein said control signal is produced by a network management system.**

Jonas discloses the sending router computer recognizes the request to transmit over the

bypass network, establishes a connection over the circuit-switched telephone network, and then

transmits the packet over the bypass circuit-switched telephone network.... This is accomplished

by having the system monitor the transmission delay between the source router 20 and

destination router 21. If this delay rises above a threshold value the source router 20 will

establish a connection over the bypass network 30, (col. 3, line 44-48; col. 5, line 56-60). Jonas,

therefore teaches the use of a threshold value to trigger a signal (control signal) to switch over to

the bypass network and transmit over this line-switched network.


*Regarding claim 69:*

**Switching apparatus for selectively routing a telephone call from a first end**

**terminal to a second end terminal, comprising:**

Jonas discloses a switching apparatus (Router 20) for selectively routing a telephone call

from a first end terminal (Host 1) to a second end terminal (Host 2). Hosts 1 and 2 would

transmit data to each other through routers 20 and 21 over the Internet 40, (col. 4, lines 13-14).

**means for establishing a connection to a packet switching network through which**

**data can be sent to the second end terminal;**

Jonas discloses a device (Router 20) that establishes a connection to a packet switching

network (the Internet) through which data can be sent for to the second end terminal. Normally,

hosts 1 and 2 would transmit data to each other through routers 20 and 21 over the Internet 40,

(col. 4, lines 13-14). Host 1 may be permanently connected to router 20 via a phone line leased

from the local telephone service 11, or, alternatively, connected to router 20 via a switched dial-

up connection provided by the local telephone service 11, using a modem, ISDN adapter (not

shown) or other device for transmitting data. Routers 20 and 21 are typically provided by an

Internet Commercial Service Provider, however, alternate configurations are also available, such

as one or more of the hosts being directly connected to the Internet as a router or gateway

computer.

**means for transferring first data of the telephone call originated by the first end
terminal over the connection through the packet switching network for delivery to the
second end terminal,**

Jonas discloses Router 20 for transferring first data (a packet or packets in a stream of

packets) of the telephone call originated by the first terminal (host 1) through the packet

switching network (Internet 40) for delivery to the second end terminal (Host 2). Normally, hosts

1 and 2 would transmit data to each other through routers 20 and 21 over the Internet 40, (col. 4,

lines 13-14).

**means for establishing a connection to a line-switching network through which data
can be sent for delivery to the second end terminal;**

Jonas discloses a device (Router 20) for establishing a connection to a line-switching

network (Bypass network 30) through which data can be sent for delivery to the second end

terminal (Host 2). "The source router 20 then establishes a connection (i.e. "dials" the call) over

the circuit-switched [line-switched] network 30 to the destination router 21...., (col. 4, line 67-

col. 5, line 3).

Application/Control Number: 95/001,001                                    Page 36
Art Unit: 3992

**means for transferring second data of the telephone call originated by first end terminal over the connection through the line-switching network for delivery to the second end terminal; and**

Jonas discloses (Router 20) for transferring second data (a portion of packets in a stream of packets) of the telephone call originated by the first terminal (Host 1) over the connection through the line-switching network (Bypass Network 30) for delivery to the second end terminal (Host 2). "The destination router 21 will receive notification of an incoming call over the circuit-switched network and execute a process to accept the connection and integrate data packets from this connection [second data] into the packets received from the packet-switched connection [first data]."

**means responsive to a control signal for changing-over from a packet-switching mode of transfer of the first data of the telephone call to a line-switching mode of transfer of the second data of the telephone call without interruption of a call set-up procedure.**

Jonas discloses responding to control signal to change from the packet switching network (Internet 40) to a line-switching connection (Bypass Network 30) to the second switch (Router 21). Jonas discloses if conditions are yet to change over from Internet 50 to Bypass Network 30. Certain applications, may wish to dynamically take advantage of both the inherent cost benefit of using the packet-switched Internet and the minimal delay time of circuit-switched telephone networks. This is accomplished by having the system monitor the transmission delay between the source router 20 and destination router 21. If this delay rises above a threshold value the source router 20 will establish a connection over the bypass network 30. The source router 20 may detect the transmission delay to the destination router 21 using a variety of measures known

Application/Control Number: 95/001,001                                          Page 37
Art Unit: 3992

to those skilled in the art, including topological delay time for the transmission..., (col. 5, lines
63-64).

### Regarding claims 71 and 75:

The rejection was proposed by the third party requester in the request for reexamination,
and it is adopted for the reasons set forth in the request for reexamination at page 261 (claim 71
under Jonas '792) and pages 266-267 (claim 75 under Jonas '792), which are hereby
incorporated by reference.


### Regarding claim 77:

**A method of selectively routing a telephone call from a first end terminal to a second
end terminal, comprising:**

Jonas discloses a switching apparatus (Router 20) for selectively routing a telephone call
from a first end terminal (Host 1) to a second end terminal (Host 2). Hosts 1 and 2 would
transmit data to each other through routers 20 and 21 over the Internet 40, (col. 4, lines 13-14).

**establishing access of said first end terminal to a packet switching network through
which data can be sent for delivery to the second end terminal;**

Jonas discloses a device (Router 20) that establishes a connection to a packet switching
network (the Internet) through which data can be sent for to the second end terminal. Normally,
hosts 1 and 2 would transmit data to each other through routers 20 and 21 over the Internet 40,
(col. 4, lines 13-14). Host 1 may be permanently connected to router 20 via a phone line leased
from the local telephone service 11, or, alternatively, connected to router 20 via a switched dial-
up connection provided by the local telephone service 11, using a modem, ISDN adapter (not

Application/Control Number: 95/001,001                                    Page 38
Art Unit: 3992

shown) or other device for transmitting data. Routers 20 and 21 are typically provided by an

Internet Commercial Service Provider, however, alternate configurations are also available, such

as one or more of the hosts being directly connected to the Internet as a router or gateway

computer.

**transferring first data of the telephone call originated by the first end terminal over**

**the packet switching network for delivery to the second end terminal,**

Jonas discloses Router 20 for transferring first data (a packet or packets in a stream of

packets) of the telephone call originated by the first terminal (host 1) through the packet

switching network (Internet 40) for delivery to the second end terminal (Host 2). Normally, hosts

1 and 2 would transmit data to each other through routers 20 and 21 over the Internet 40, (col. 4,

lines 13-14).

**responding to a control signal for changing-over from a packet-switching mode of**

**transfer of the first data of the telephone call to a line-switching mode of transfer of second**

**data of the telephone call originated by the first end terminal without interruption of a call**

**set-up procedure,**

Jonas discloses responding to control signal to change from the packet switching network

(Internet 40) to a line-switching connection (Bypass Network 30) to the second switch (Router

21). Jonas discloses if conditions are yet to change over from Internet 50 to Bypass Network

30. Certain applications, may wish to dynamically take advantage of both the inherent cost

benefit of using the packet-switched Internet and the minimal delay time of circuit-switched

telephone networks. This is accomplished by having the system monitor the transmission delay

between the source router 20 and destination router 21. If this delay rises above a threshold value

Application/Control Number: 95/001,001                                    Page 39
Art Unit: 3992

the source router 20 will establish a connection over the bypass network 30. The source router 20

may detect the transmission delay to the destination router 21 using a variety of measures known

to those skilled in the art, including topological delay time for the transmission..., (col. 5, lines

63-64).

**by establishing a connection from said first end terminal to a line-switching network**

**through which data can be sent for delivery to the second end terminal and establishing**

**said line-switching mode of transfer of the second data of the telephone call over the**

**connection through the line-switching network for delivery to the second end terminal.**

Jonas discloses a device (Router 20) for establishing a connection to a line-switching

network (Bypass network 30) through which data can be sent for delivery to the second end

terminal (Host 2). The source router 20 then establishes a connection (i.e. "dials" the call) over

the circuit-switched [line-switched] network 30 to the destination router 21.... , (col. 4, line 67-

col. 5, line 3).

Jonas discloses (Router 20) for transferring second data (a portion of packets in a stream

of packets) of the telephone call originated by the first terminal (Host 1) over the connection

through the line-switching network (Bypass Network 30) for delivery to the second end terminal

(Host 2). The destination router 21 will receive notification of an incoming call over the circuit-

switched network and execute a process to accept the connection and integrate data packets from

this connection into the packets received from the packet-switched connection.

***Regarding claims 79 and 82:***

The rejection was proposed by the third party requester in the request for reexamination,

and it is adopted for the reasons set forth in the request for reexamination at pages 291-292